#25992-a-JKK

**2012 S.D. 46**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                     Plaintiff and Appellee,

    v.

DENNIS MOST,                               Defendant and Appellant.


* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIRST JUDICIAL CIRCUIT
UNION COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE STEVEN R. JENSEN
Judge

* * * *

MARTY J. JACKLEY
Attorney General

DONALD E. TINKLEPAUGH
Assistant Attorney General
Pierre, South Dakota                       Attorneys for plaintiff and
                                           appellee.


MICHAEL J. MCGILL
Beresford, South Dakota                    Attorney for defendant and
                                           appellant.


* * * *

ARGUED ON MARCH 21, 2012

OPINION FILED **06/06/12**

#25992

KONENKAMP, Justice

[¶1.] Dennis Most, Sr. was convicted in a bench trial of four counts of sexual contact with a child. On appeal, he contends that the trial court erred in denying his motion to exclude prior acts evidence and his motion to offer the victim's prior allegation of sexual assault. He also argues that there was insufficient evidence to sustain his convictions.

## Background

[¶2.] K.D.'s paternal grandmother, Gail Ford, and Most, Ford's boyfriend, lived together in North Sioux City, South Dakota. When K.D. was three or four years old, her mother took a new job that required working on the weekends, and K.D. began staying at Ford's home. Eventually, she would spend the night and often entire weekends with Ford and Most. At the time, K.D. was the only grandchild. Ford owned a barber shop and worked Saturdays. K.D. would either stay with Ford at the shop or go home with Most. In addition, if Ford had errands to run, K.D. would sometimes come along, while other times she would stay at home with Most. K.D. considered Most her grandfather.

[¶3.] In March 2009, shortly after Ford passed away, K.D. told her mother that Most had sexually molested her during the time she was four-to-eleven years old. K.D. was seventeen at the time. She came forward at that time because she was no longer fearful that the disclosure would hurt her grandmother. K.D.'s mother reported the allegations to the authorities and an investigation ensued. Amy Scarmon, a forensic interviewer with the Child Advocacy Center, interviewed K.D. about the allegations.

[¶4.]     Law enforcement officers interviewed Most. The officers observed that Most was not shocked or angry by the allegations. He was very talkative, even initiating a second interview to clarify certain points and tell his side of the story. He denied the allegations, but admitted that he tickled and wrestled around with K.D. He said that he may have touched K.D.'s breasts, inner thighs, and vaginal region during these times, and that some of the touching may have been inappropriate, but that all the touching was accidental and unintentional. Most also told the officers that obviously something happened that probably should not have, and acknowledged K.D.'s honesty. The officers assisted K.D. in recording three phone conversations with Most. During these calls, she confronted him with her allegations, but Most neither admitted nor denied them.

[¶5.]     K.D. identified four incidents of sexual molestation. She explained that Most molested her more than four times, but that she was only able to establish approximate time frames for the four separate incidents. The first incident occurred between December 1995 and January 1996, when K.D. was four years old. She isolated this time frame because the molestation occurred after Christmas but before she and her mother moved into a new home. During that incident, Most told K.D. that he had something for her in his bedroom. When she went into the bedroom, Most began tickling her and removed her clothing. According to K.D., Most asked her if she wanted to have sex, digitally penetrated her vagina, and then resumed tickling her. K.D. said that Most stopped when Ford came home. Most told K.D. to go out into the living room and threatened that if she told Ford about the incident, he would hurt Ford.

[¶6.]     The second incident occurred during the summer months of 1999.[1] Most again told K.D. that he had something for her in his bedroom. When K.D. went into the bedroom, Most began tickling her and removed her clothing. According to K.D., Most digitally penetrated her vagina, asked her if she liked it, and then resumed tickling her.

[¶7.]     The third incident occurred in October 2001, just before K.D.'s tenth birthday. She said that Most duct taped her, put her in a blue Neon car, drove behind the Gateway building, and digitally penetrated her vagina.[2] Most asked K.D. if she liked what he was doing. She asked Most to stop. He then removed the duct tape and acted as though nothing had happened.

[¶8.]     The fourth incident occurred in October 2003, when K.D. was eleven years old.[3] K.D. was in Ford's and Most's bedroom when Most came in and asked her what she was doing. She replied that she was simply looking around. Most began tickling her. She became nervous and did not know what to do. Most

---

1. K.D. first testified that it happened during school, then said that it happened during summer vacation. She also testified that she was eight years old when this occurred, but Most argues that she would have been seven years old at that time. Finally, K.D. testified that this was the summer between her second and third grade school years, but Most argues that the summer of 1999 would divide her first and second grade school years.

2. K.D. told Scarmon, the child forensic interviewer, that Most duct taped her in three places. At trial, however, K.D. testified that she was duct taped in only two places, her wrists and ankles. Furthermore, K.D. told Scarmon that there was no digital penetration during this third incident, but then testified at trial that Most digitally penetrated her in the car.

3. K.D. first testified that this incident occurred after Christmas. Then she testified that it occurred around Halloween.

laid her on the bed, removed her clothing, and digitally penetrated her vagina. She finally got Most to stop by telling him that she needed to use the bathroom. After these incidents, Most gave her money, candy, or gifts.

[¶9.] During the investigation, officers discovered that two other family members claimed that Most molested them as young girls. L.S., Most's stepdaughter, said that Most molested her between the ages of four and eleven. Most would take L.S. to his bedroom, tickle her, and touch her breasts and genitals. He often gave her gifts or money after the acts. In addition, when L.S. was about fifteen years old, she learned she was pregnant, ran away from home, and moved in with Most. During this time, Most continued to sexually abuse her. In June 2009, immediately after being interviewed by law enforcement officers about K.D.'s allegations, Most unexpectedly arrived at L.S.'s home. He told L.S. about K.D.'s allegations, and L.S. then confronted Most about her abuse. Most admitted to sexually molesting L.S. When she asked why he did it, Most explained that he loved her and thought it made her feel good.

[¶10.] Most and L.S. also discussed Most's prior abuse of S.M., Most's niece. Starting when she was five or six years old, Most would take S.M. to a bedroom or in a car to a park. He would touch her genitals and masturbate in front of her. The abuse stopped when S.M.'s mother discovered that S.M.'s pants were on backwards after spending time alone with Most. Most also gave S.M. money to buy candy after the acts. L.S. and S.M. confronted Most about the sexual abuse while secretly tape-recording the conversation for law enforcement investigators. He admitted to

sexually molesting both women. When L.S. and S.M. asked about K.D.'s sexual abuse, however, Most denied the allegations.

[¶11.] The State charged Most with four counts of first-degree rape under SDCL 22-22-1(1) and, alternatively, with four counts of sexual contact with a child under the age of sixteen under SDCL 22-22-7. He pleaded not guilty to all charges.

[¶12.] Before trial, the State moved to introduce the molestation incidents with L.S. and S.M. as other acts evidence under SDCL 19-12-5 (Rule 404(b)). The State argued that the evidence was relevant to the issues of intent, motive, and common plan or scheme. Most moved in limine to keep out this testimony, arguing that these prior acts of uncharged misconduct were too remote and not sufficiently similar to K.D.'s allegations and that certain matters, such as identity, were not at issue in the case. The trial court granted the State's motion in part.[4]

[¶13.] Most also moved to introduce evidence of K.D.'s prior sexual conduct under SDCL 23A-22-15. He claimed that in 2007, K.D. made a false report of sexual assault; he sought to attack K.D.'s credibility with this evidence. The court denied Most's motion, finding that the prior report was not "demonstrably false" and that the probative value of this evidence was substantially outweighed by the danger of unfair prejudice.

[¶14.] Most waived his right to a jury trial. After a four-day bench trial, the circuit court found Most not guilty of the four rape counts and guilty of the four counts of sexual contact with a child under the age of sixteen. He was sentenced to

---

4. The court ruled that the acts occurring when L.S. was in her teens and living with Most were inadmissible.

ten years in the penitentiary on the first count, with five years suspended, ten years on the second count, ten years on the third count, and ten years suspended on the fourth count, all sentences to run consecutive to each other. Most appeals, alleging three trial errors: (1) abuse of discretion in denying Most's motion in limine and admitting prior acts evidence; (2) abuse of discretion in denying Most's motion to introduce evidence of a prior false sex crime allegation; and (3) insufficiency of the evidence to support the convictions.

### 1. Admission of Other Acts Evidence

[¶15.]    Most argues that the court abused its discretion when it admitted the prior acts evidence regarding L.S. and S.M. He contends that the prior acts were too remote, insufficiently similar, and substantially more prejudicial than probative.

[¶16.]    The admissibility of other acts evidence is governed by SDCL 19-12-5 (Rule 404(b)):

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

"To determine the admissibility of other acts evidence, the court must . . . determine: (1) whether the intended purpose is relevant to some material issue in the case, and (2) whether the probative value of the evidence is substantially outweighed by its prejudicial effect." *State v. Bruce*, 2011 S.D. 14, ¶ 8, 796 N.W.2d 397, 401 (quoting *State v. Huber*, 2010 S.D. 63, ¶ 56, 789 N.W.2d 283, 302).

[¶17.]    In addition, admission of prior acts evidence must be "weighed with the question of remoteness." *State v. Fisher*, 2010 S.D. 44, ¶ 28, 783 N.W.2d 664,

673.  "Our rule on this subject is not rigid: it will depend on the facts of the case."

*Id.*  It will also depend on the nature of the prior acts.  *State v. Ondricek*, 535

N.W.2d 872, 877 (S.D. 1995).  Furthermore, "[r]emoteness and similarity must be

considered together because the two concepts are so closely related; the remoteness

of a prior crime takes on increased significance as the similarity between the prior

crime and the charged offense increases."  *Fisher*, 2010 S.D. 44, ¶ 28, 783 N.W.2d at

673 (alteration in original) (quoting *Fisher v. State*, 641 N.E.2d 105, 109 (Ind. Ct.

App. 1994)).  "Accordingly, 'a prior bad act, despite its remoteness, may still be

relevant if it is strikingly similar to the charged offense.  Conversely, less similarity

may be required where the prior act is closer in time to the charged incident.'"  *Id.*

(quoting *Fisher v. State*, 641 N.E.2d at 109).

[¶18.]		In this case, the prior acts with S.M. began in 1968 or 1969, when S.M.

was five or six and Most was eighteen or nineteen.  The acts with L.S. occurred from

1977 through 1984, when she was four-to-eleven years old.  The trial court held

several hearings while considering the motions on the prior acts evidence.  At one of

the hearings, Most admitted to sexually molesting S.M. and L.S. when they were

young.  Acknowledging that these prior uncharged acts were remote, the court

ultimately held that the evidence was admissible for the purposes of intent and

absence of mistake or accident and that the probative value of the evidence was not

substantially outweighed by the danger of unfair prejudice.  The court found that

the present allegations and the prior acts were "substantially similar" in several

respects: the victims were females abused starting when they were four-to-six years

old until they were about eleven years old; the abuse occurred in two specific

locations — bedrooms or cars; the victims bore some familial relationship to Most; and the nature of the abuse was similar.

[¶19.]     Most argues that the prior acts involving S.M. were insufficiently similar to K.D.'s allegations.[5]  S.M. is a blood relative and K.D. is not.  S.M. could not specify sexual contact when she was ten or eleven, while K.D. alleged a fourth incident when she was eleven.  Most contends that the nature of the sexual contact was different: S.M. said that Most asked her to perform oral acts and masturbated in front of her, while those acts were not alleged by K.D.  Most also argues that the prior acts admitted in this case concerning both S.M. and L.S. were too remote to be admissible.  We acknowledge that these prior uncharged acts were very remote, going back decades, but we must consider remoteness together with similarity.

[¶20.]     Despite Most's argument otherwise, the facts in *Fisher*, 2010 S.D. 44, 783 N.W.2d 664, are not analogous to this case.  In *Fisher*, the defendant was charged with multiple rape and sexual contact offenses against his daughter.  *Id.* ¶ 3.  Fourteen years earlier, when the defendant was seventeen, he pleaded guilty to sexual contact with a child after an incident with his thirteen-year-old stepsister.  *Id.* ¶ 5.  The trial court granted the State's motion to admit the defendant's conviction under SDCL 19-12-5 as other acts evidence.  *Id.*  On appeal, we noted the differences in the two offenses: the stepsister was only related by marriage, while the daughter was related by blood; the defendant was only four years older than his stepsister at the time of the sexual contact, while the defendant was thirty-one and

---

5.     Most does not argue that the prior acts involving L.S. are dissimilar to K.D.'s allegations.

his daughter was eight when the abuse started; the stepsister did not live in the same home as the defendant, while the daughter lived in the same home. *Id.* ¶ 29. In addition, we noted that the defendant was a juvenile when he committed the prior offense against his stepsister, and an adult when he allegedly sexually abused his daughter. *Id.* ¶ 30. Therefore, we concluded that the trial court abused its discretion in admitting the prior conviction because "it was too remote in time and too dissimilar to be deemed relevant." *Id.* ¶ 31.

[¶21.] Unlike the defendant in *Fisher*, who was close in age to the prior victim and much older than the later victim, Most was always much older than his victims. Also unlike the defendant in *Fisher*, who lived with his daughter but did not live in the same home as his prior victim, Most did not live in the same home as any of his victims. In addition, even though neither L.S. nor K.D. were related to Most by blood, L.S. testified that she considered Most her father — the only father she ever knew — and K.D. testified that she considered Most her grandfather. S.M. was related to Most by blood as his niece. Moreover, Most was not a juvenile when he committed the prior acts. He was eighteen or nineteen when he started abusing S.M. and was even older when he abused L.S. There are also other similarities between Most's prior acts and K.D.'s allegations: Most gave all three victims gifts and money following the abuse; he abused all three victims in bedrooms or cars; and he abused his victims when they were about four years old to eleven years old.

[¶22.] In *Ondricek*, we explained why prior acts involving child sex abuse by a family member may be admissible despite being remote:

> Taking into account the shame and fear often experienced by
> victims of abuse and the fact that victims of molestation are

children, lengthy delays in reporting abuse, much less testifying to it in open court, are not surprising. The record indicates [that] Ondricek's status as a family member further compounded his victims' reluctance to come forward; they feared any disclosures would be disbelieved or would destroy family ties. Additionally, Ondricek had to create opportunities during which he could abuse his victims. . . . Consequently, the nature of Ondricek's acts, and the manner in which he operated, required his sexual improprieties be spread out over time. Furthermore, unlike children who are victimized by parents, teachers, or babysitters, the record suggests the child victims in this case were able, to some extent, to avoid situations where they would be alone with the offender. Where such is the case, a longer time span between alleged offenses should not bar the admission of probative evidence.

535 N.W.2d at 877 (internal citation omitted). Under this rationale, we rejected Ondricek's argument that the prior acts evidence was too remote. *Id.* Much of the *Ondricek* rationale applies in this case. L.S., S.M., and K.D. all testified that they were fearful of disclosing the abuse by a family member. K.D. testified that she waited to come forward because she did not want to hurt her grandmother, Most's girlfriend. In addition, L.S. and S.M. said that they had told other family members about the sex abuse, but no one believed them until Most admitted it in 2009. Furthermore, K.D. testified that as she grew older, she purposely avoided situations where Most could be alone with her. This created a longer time span between the alleged offenses.

[¶23.] Courts weighing the admissibility of prior acts evidence are often concerned with the danger of a "trial within a trial" where defendants are forced to defend themselves against past allegations while also defending against the present charges. Bearing on this are such considerations as the possibility of confusion of issues and the time expended in offering and rebutting evidence. SDCL 19-12-3

(Rule 403); SDCL 19-14-18 (Rule 611(a)). But these concerns were considerably alleviated here because Most admitted the prior acts in court. And the trial court carefully weighed the evidence and excluded some of the prior acts that were not similar to K.D.'s allegations.

[¶24.] In addition to Most's general denial, he claimed that he often tickled and wrestled with K.D. He said that during these times he may have inappropriately touched her but that all such touching was accidental. Therefore, the incidents with L.S. and S.M., though remote, were relevant to establish Most's intent and lack of mistake or accident: they plainly refuted Most's claim that his similar touching of K.D. was unintentional. The trial court found, and we agree, that the prior acts were factually and legally relevant. Moreover, we cannot say that the trial court abused its discretion in finding that the probative value of this evidence was not substantially outweighed by the danger of unfair prejudice.

## 2. Demonstrably False Prior Sex Crime Accusation

[¶25.] Most argues that K.D.'s allegations in a prior case were demonstrably false and that this evidence should not have been excluded. "[T]o be admissible for cross-examination purposes, [a] prior sex crime accusation must be demonstrably false before it can be considered relevant." *State v. Sieler*, 397 N.W.2d 89, 92 (S.D. 1986). "When using the 'demonstrably false' standard, mere denial of the accusation is not enough." *Id.* (citing *State v. Kringstad*, 353 N.W.2d 302, 311 (N.D. 1984)). Nor is "arguably false" adequate. *Id.* (citing *State v. Demos*, 619 P.2d 968, 970 (Wash. 1980)). "In some instances even a not guilty verdict on an asserted false charge may not be enough to make the prior accusations relevant." *Id.* (citing *State*

*v. Schwartzmiller*, 685 P.2d 830, 833 (Idaho 1984)). "The 'demonstrably false' standard appropriately keeps the focus on the defendant instead of turning the trial into one of the victim." *Id.* (citing *State v. Anderson*, 686 P.2d 193, 200 (Mont. 1984)).

[¶26.]        In this case, in 2007, K.D.'s step-father reported that K.D.'s former boyfriend made an unwanted sexual advance toward K.D. According to K.D., the former boyfriend kissed her, asked her for sexual intercourse, and after she declined, tried putting his hand down her pants. The former boyfriend admitted to most of the allegations, but denied that he tried to put his hands down K.D.'s pants. The former boyfriend told law enforcement officers that when K.D. declined his advances, he stopped. K.D. refused to press charges and the former boyfriend was never prosecuted for the incident. Most classified this incident as a prior false report of sexual assault, relevant to K.D.'s credibility.

[¶27.]        After a hearing, the trial court reviewed the police report detailing the incident between K.D. and her former boyfriend. The court noted that this was a "he said, she said" situation with no definite resolution on whether K.D.'s claims were false. The court noted that the report did not indicate that the former boyfriend was not prosecuted because the allegations were false. Instead, the report explained that K.D. was not interested in pressing charges. The court found that Most did not demonstrate that the prior report was "demonstrably false." It also concluded that the probative value of this evidence was substantially outweighed by the danger of unfair prejudice. Upon this record, we cannot say that the trial court abused its discretion when it denied Most's motion to offer this evidence.

### 3. Sufficiency of the Evidence

[¶28.]      Most argues that there was insufficient evidence to sustain his convictions.  He contends particularly that the State did not prove that he had the specific intent to arouse or gratify his or K.D.'s sexual desire.  He also asserts that K.D.'s testimony was not credible and that his testimony created a reasonable doubt about his access to K.D.

[¶29.]      "In measuring the sufficiency of the evidence, we ask whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *State v. Stark*, 2011 S.D. 46, ¶ 21, 802 N.W.2d 165, 172 (quoting *State v. Brim*, 2010 S.D. 74, ¶ 6, 789 N.W.2d 80, 83).  "We accept the evidence and the most favorable inferences fairly drawn therefrom which will support the verdict."  *Id.*  In addition, "[t]his Court will not resolve conflicts in the evidence, assess the credibility of witnesses, or evaluate the weight of the evidence."  *Id.*

[¶30.]      Here, Most steadfastly contested K.D.'s credibility.  In its findings of fact, the trial court recounted K.D.'s testimony and its inconsistencies.  The court noted that K.D. was very nervous, struggled with specific dates and events, and that her testimony at trial was more detailed than her initial interviews.  Yet the trial court specifically found that K.D.'s testimony concerning the sexual contact with Most was credible.[6]  We will not reassess the credibility of witnesses on appeal.

---

6.      The trial court found it had a reasonable doubt on the rape charges.  The court had no reasonable doubt that sexual contact had occurred between Most and K.D., but was concerned about whether there was in fact sexual penetration in each of the four incidents.

Given that the trial court had the opportunity to observe the live testimony, we must defer to the trial court on this credibility issue.

[¶31.] Most also claims that the testimony about his lack of access to K.D. created a reasonable doubt whether he could have committed the offenses. The trial court made specific findings regarding Most's access to K.D. during the time frames of the four incidents. The court relied on testimony from K.D.'s mother, Most, and K.D. The court also considered testimony from defense witnesses who claimed that Most had limited-to-no individual access to K.D. The court also noted, however, that during cross-examination, all these defense witnesses acknowledged that there could have been times when Most had one-on-one access to K.D. We will not resolve these conflicts in the evidence, assess the credibility of the witnesses, or reevaluate the weight of their testimony. We defer to the trial court on these issues. On appeal, our function is to examine the record to determine whether it supports the court's findings regarding Most's access to K.D. during the relevant time periods. The record clearly supports the court's findings.

[¶32.] Most argues that there was not sufficient evidence to establish the intent element beyond a reasonable doubt. The trial court found that Most had sexual contact with K.D. with the intent to satisfy his own sexual desires based on the prior act evidence. In addition, K.D. testified that during the sexual contact, Most would ask her if she liked it. Viewing the evidence in the light most favorable to the State, we conclude that a rational trier of fact could have found the intent element beyond a reasonable doubt. Upon this record, and accepting the evidence

and the most favorable inferences fairly drawn therefrom that will support the verdict, there was sufficient evidence to sustain Most's convictions.

[¶33.]     Affirmed.

[¶34.]     GILBERTSON, Chief Justice, and ZINTER, SEVERSON, and WILBUR, Justices, concur.