#29095-a-PJD
**2021 S.D. 12**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

   v.

HARRY DAVID EVANS,                         Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
CUSTER COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE JEFF W. DAVIS
Retired Judge

\* \* \* \*

JASON R. RAVNSBORG
Attorney General

QUINCY R. KJERSTAD
Assistant Attorney General
Pierre, South Dakota                      Attorneys for plaintiff and
                                          appellee.


JOHN R. MURPHY
Rapid City, South Dakota                  Attorney for defendant and
                                          appellant.

\* \* \* \*

ARGUED
OCTOBER 6, 2020
OPINION FILED **02/24/21**

DEVANEY, Justice

[¶1.]        Henry David Evans appeals his conviction entered after a jury found him guilty of several charges, including rape, kidnapping, aggravated assault, and burglary.  Evans challenges the circuit court's denial of his pretrial motion to suppress, claiming the state law enforcement officers were without jurisdiction to seize his personal property located on the Pine Ridge Indian Reservation.  He further contends the court committed a structural error by substantially deviating from the statutory procedures governing jury selection.  Finally, Evans asserts the circuit court abused its discretion in admitting other act evidence from his ex-wife and in admitting an officer's testimony regarding corroboration of the victim's account of the incident.  We affirm.

**Factual and Procedural Background**

[¶2.]        Harry David Evans and S.B. met through an online dating site in 2016.  At that time, S.B. was going through a divorce and was looking for companionship and help with taking care of her large property in Pennington County, where she raised horses.  The two began spending a lot of time together, and S.B. let Evans live in the basement of her home.  Their relationship eventually turned romantic.

[¶3.]        About six months into their relationship, S.B. noticed that Evans was trying to control her behavior.  The two began to argue and fight, and S.B. claimed that during one incident in December 2016, Evans trapped her in a room in the basement, told her they were not leaving the room, and threatened to shoot her and then himself.  Approximately 45 minutes later, S.B. kicked Evans and was able to

push her way out of the room. She ran upstairs and called law enforcement, but by the time the officers arrived, Evans had left. S.B. called law enforcement again in January 2017 after Evans took her to her bedroom and told her he would either rape or murder her, and if he could not have her, nobody could. Once again, by the time the officers arrived, Evans had already left.

[¶4.] Although these incidents left their relationship strained, S.B. continued to have an on-and-off intimate relationship with Evans. In the summer of 2017, Evans contacted her looking for work. By that time, S.B. had sold her property in Pennington County and was preparing to move into a modular home located on her recently purchased land near Hermosa, South Dakota. She claimed she let Evans back into her life because she felt sorry for him. According to S.B., Evans helped her with the move and with building fences on her new property.

[¶5.] S.B. eventually determined she no longer wanted a relationship of any sort with Evans and told him he needed to leave her property and never come back. Although Evans did leave, he continued to send S.B. texts daily, some of them harassing and threatening. S.B. obtained a temporary protection order against Evans on July 26, 2017, but she still feared him because of several incidents suggesting that Evans was maintaining indirect contact with her. For example, S.B. found a bale of hay and a water tank for her horses on her property line, cable wiring at the base of her driveway, a note with Evans's handwriting on the ground next to her vehicle, and her favorite candies in her mailbox. She also believed Evans had been taking her mail and going through her garbage. S.B. reported each of these acts to law enforcement, and they eventually set up game cameras around

S.B.'s property for surveillance. S.B. also contacted Hermosa Town Marshal Jim Daggett to check her property on occasions when she feared Evans was trespassing.

[¶6.] On August 23, 2017, the day before the court entered a permanent protection order against Evans, S.B. received a lengthy text message from Evans stating emphatically that he loves her, she is like a drug to him, and he will die if he does not have her. Within the text, Evans stated multiple times that he knew S.B. would call law enforcement and explained that he was going to end his life because he could not live without her. He asked that she refrain from telling anyone about his plan. S.B. reported the text to law enforcement, and on September 4, 2017, Evans turned himself in for violating the protection order. However, he did not spend any time in jail because he was released on bond.

[¶7.] On the evening of September 5, 2017, after receiving what she perceived to be a threatening message from Evans through social media, S.B. called law enforcement for assistance. Around 11:30 p.m., Marshal Daggett responded and searched her property and home, but found no sign of Evans. After the Marshal left, S.B. took a sleeping pill and estimated that she had fallen asleep around 1:00 a.m.

[¶8.] Before the sun rose, S.B. awoke to the sound of Evans's voice beside her in bed. She tried to get away, but Evans overpowered her, forced sleeping pills into her mouth, and put duct tape around her mouth, hands, arms, and legs. S.B. testified that Evans wrapped her in a blanket and dragged her down the stairs and outside into her vehicle. S.B. explained that she blacked out, and when she awoke, she was back at her house. She described how Evans then cut away some of the

duct tape and raped her while her arms were still bound. Later that morning, Evans forced S.B. to give him a ride to his truck that he had parked down the road from S.B.'s residence. S.B. then returned home, but she did not immediately report what had happened to law enforcement because Evans had threatened to kill her, her animals, and her friends if she told anyone. After remembering that Marshal Daggett had told her he would return in the morning to check on her, S.B. called him and told him there was no need to come to her home.

[¶9.] Despite S.B.'s call, Marshal Daggett went to check on S.B. and found her in a disheveled state. Although she was reluctant at first to tell him what had happened, S.B. eventually told him Evans had raped her. Marshal Daggett then contacted the sheriff's office, and S.B. was taken to the hospital for a sexual assault examination while law enforcement investigated the incident. Members of a sexual assault response team interviewed S.B. and conducted a head-to-toe examination, documenting their observations and collecting evidence swabs.[1] Nurse Donna Degen testified that she observed tape residue on S.B.'s arm and rear hip area. She also observed bruising on S.B.'s right upper arm, left and right forearm, left inner thigh, upper torso, and an area extending from her left knee to her calf and lower leg. Degen further testified that S.B.'s pelvic exam revealed a slight abrasion on her right labia majora. Jeff Goble, an agent with the South Dakota Division of Criminal Investigation (DCI), also interviewed S.B. while she was at the hospital and photographed her injuries.

---

1. Evans's DNA profile was later found on S.B.'s vaginal and cervical swabs.

[¶10.]    Multiple officers searched S.B.'s home, vehicle, and surrounding property.  They located several items of significance in her vehicle, including a handgun, a pair of leather work gloves, a ball of duct tape, a knife, and a pick axe.  They found two more balls of duct tape in S.B.'s kitchen (later found to contain DNA originating from S.B.), a partial roll of duct tape in her bedroom, and a washcloth containing semen in her bathroom sink.[2]  Additionally, the officers observed that the screen in the window to S.B.'s bathroom had been cut and two game cameras had been ripped off the locations on which they had been mounted.

[¶11.]    Special Agent Robert Palmer obtained search warrants for Evans's person and his pickup, and on September 7, he also obtained a warrant for Evans's arrest.  That same day, law enforcement learned that Evans's cellphone had pinged off a tower east of Oglala, South Dakota on the Pine Ridge Indian Reservation, and Fall River County Sheriff Bob Evans located Evans's pickup in the parking lot of the Prairie Winds Casino within the boundaries of the Reservation.  Based on this information, Special Agent Palmer and Agent Goble contacted the Oglala Sioux Tribal Police (OST) and the Oglala Lakota County Sheriff (a state law enforcement officer) for permission to enter the Reservation to serve the warrant.  Both agencies sent officers to assist in apprehending Evans at the casino.

---

2.    S.B.'s DNA was found on several swabs taken from the balls of duct tape and from the edge of the roll of duct tape found in her bedroom.  Other swabs from the duct tape balls contained a mixture of DNA from two individuals.  S.B. was identified as the major contributor to these mixture samples, and Evans could not be excluded as the other contributor.  DNA from both Evans and S.B. was also found on the washcloth in S.B.'s sink.

[¶12.]	When Special Agent Palmer and Agent Goble arrived at the casino, they observed Evans's pickup in the casino parking lot and waited for the other officers to arrive. OST Officer Hudspeth arrived and was informed about the situation by the agents. He then attempted to locate Evans inside the casino with the assistance of casino security. After learning that Evans had rented a room, the agents, along with OST Officer Hudspeth and Oglala Lakota County Sheriff Conroy, attempted to get Evans to come to the front desk by having hotel management call his room and his cell phone. The calls were not answered.

[¶13.]	Casino security then advised law enforcement officers on scene that from the ground-level exterior window of the room Evans had rented, they could see an individual lying on the bed. The officers, including the DCI agents and OST Police Chief Mesteth, stood outside the room while hotel management called the room again. Special Agent Palmer testified that he could hear the phone ringing in the room, but there was no answer or movement in the room. He knocked on the door several times with no response, and casino security informed him that the individual on the bed did not move during or after the knocks or phone calls.

[¶14.]	Based on the lack of response, OST Police Chief Mesteth directed the tribal officers to enter the hotel room for a welfare check. Special Agent Palmer followed them inside. After an OST officer pulled off the bedcovers, the individual on the bed was identified as Evans. An OST officer picked up a prescription bottle from the table near the bed and handed it to Special Agent Palmer, who noticed that the bottle bore S.B.'s name and was empty. He placed the bottle back on the table and did not seize it at that time. Evans was slow to move, and his speech was

hard to understand, so the officers called an ambulance. Sheriff Conroy then placed Evans under arrest on the Custer County warrant.

[¶15.]     After Evans was taken from the hotel room, law enforcement officers left the room and secured it with evidence tape. Evans's pickup was towed from the casino parking lot to the Custer County Department of Transportation shop until an Oglala Lakota County search warrant could be obtained. On September 8, 2017, Special Agent Palmer obtained a warrant from the Seventh Judicial Circuit Court, Oglala Lakota County, to search the hotel room at the casino and Evans's pickup.

[¶16.]     While en route to search the hotel room, Special Agent Brett Garland obtained permission from OST Police Chief Mesteth and Sheriff Conroy to proceed with the execution of the warrant. An Oglala Lakota County deputy met Special Agent Palmer and Special Agent Garland at the hotel room and was present while the agents searched the room and seized a Copenhagen chewing tobacco tin, a bottle of Gatorade, Evans's cellphone, and the empty prescription bottle of Ambien with S.B.'s name on it. A search of Evans's pickup revealed bullets, a Gatorade bottle, cans of spray paint, leather work gloves, a knife, and notebooks or diaries containing Evans's writings pertaining to S.B.

[¶17.]     A grand jury indicted Evans on six counts: second-degree rape, first-degree kidnapping, aggravated assault, stalking, violation of a protection order, and first-degree burglary. Evans pled not guilty to all counts. He also filed a pretrial motion to suppress evidence seized from his hotel room and pickup. Evans, a non-Indian, asserted that state law enforcement officers lacked jurisdiction to search and seize property located on an Indian reservation.

[¶18.]     The court denied the motion to suppress. It concluded the officers had the authority to enter the hotel room to check on Evans's welfare due to his non-responsive nature, and that they were authorized to arrest Evans on the State-issued warrant. The court further determined that law enforcement lawfully reentered the hotel room to execute the State search warrant and lawfully seized and subsequently searched Evans's pickup pursuant to a valid search warrant.

[¶19.]     Prior to trial, the State filed a notice of intent to admit other act evidence under SDCL 19-19-404(b), including testimony from Evans's ex-wife, Kathy Evans, about his threatening behavior toward her in 1993 and 1994, while they were in the process of separating. Evans objected, and after an evidentiary hearing on the motion, the circuit court found these prior acts to be relevant and admissible to prove motive and common plan. The court denied admission of other statements from Kathy regarding Evans's conduct during their relationship.

[¶20.]     At the beginning of voir dire, the circuit court explained the jury selection process to the jury panel, had the attorneys introduce themselves, and identified the charges against Evans. The court then explained to the prospective jurors that the attorneys would be visiting with them about the charges after the "initial selection process." The court began this process by asking the members of the jury panel whether "being here roughly until the end of the week and the charges I just read . . . raise a red flag for any of you that will make it impossible for you to sit and be fair and impartial jurors if you are selected here today?" The record reveals that 24 prospective jurors of the 55-member jury panel raised their hands. The court responded: "Okay. I think what we'll do is take a short recess for

those of you that have raised your hands and we'll handle those out of the courtroom."

[¶21.] Once counsel, Evans, and the court reporter were in chambers, the court individually addressed each juror's concerns. After brief questioning, almost entirely by the court and without either counsel raising a challenge for cause, the court dismissed 20 of the 24 prospective jurors. Neither counsel objected to this procedure, and after jury selection resumed in the courtroom, both counsel for Evans and the State passed the jury for cause.

[¶22.] During the five-day trial, multiple witnesses testified, including S.B., Evans's ex-wife, and the sexual assault nurse examiner. Multiple law enforcement officers also testified, including Agent Goble, who testified about the photographs he had taken of S.B.'s injuries. Evans's theory of defense was that he and S.B. were still engaged in a consensual, sexual relationship on the date of the incident and that S.B. claimed he raped her to cover up her decision to allow Evans into her home in violation of the protection order.

[¶23.] The jury found Evans guilty on all counts. Evans appeals, and we restate the issues raised as follows:

1. Whether the circuit court abused its discretion in admitting other act evidence from Evans's ex-wife.

2. Whether the circuit court failed to follow statutory procedures during jury selection such that a structural or other reversible error occurred.

3. Whether the court erred in denying Evans's motion to suppress.

4. Whether the court abused its discretion in admitting Agent Goble's testimony.

## Analysis and Decision

### 1. Whether the circuit court abused its discretion in admitting other act evidence from Evans's ex-wife.

[¶24.] Evans asserts the circuit court failed to adequately consider remoteness and dissimilarity when it admitted Kathy Evans's testimony regarding Evans's conduct toward her during their separation. He further contends he was prejudiced by the admission of this evidence because Kathy's "testimony was overwhelming and irreparable," and also because the circuit court rejected Evans's request to give the jury a limiting instruction *before* Kathy testified.[3] In his view, the circumstances here are similar to those in *State v. Lassiter*, wherein this Court held the circuit court erred in admitting other act evidence from an ex-girlfriend to support the existence of motive. 2005 S.D. 8, ¶¶ 22–24, 692 N.W.2d 171, 178–79.

[¶25.] We review a circuit court's decision to admit other act evidence for an abuse of discretion. *State v. Boe*, 2014 S.D. 29, ¶ 20, 847 N.W.2d 315, 320. SDCL 19-19-404(b) governs the admission of other act evidence. It is well settled that "no 'preliminary showing is necessary before such evidence may be introduced for a proper purpose.'" *State v. Wright*, 1999 S.D. 50, ¶ 13, 593 N.W.2d 792, 798 (quoting *Huddleston v. United States*, 485 U.S. 681, 687–88, 108 S. Ct. 1496, 1500, 99 L. Ed. 2d 771 (1988)). Prior to admitting the evidence, the circuit court must determine

---

3. In addition to Kathy's testimony regarding the other acts of violence Evans committed against her, she related several conversations she had with Evans after their son noticed on Facebook that law enforcement was looking for Evans in connection to the charged offenses. Kathy testified that during these conversations, Evans confessed that he entered S.B.'s home through a window and raped her. According to Kathy, Evans stated, "I figured if I'm going to go to prison[,] I'm going to do it up right this time."

whether the evidence is relevant to a material issue other than character and whether its probative value is substantially outweighed by the danger of unfair prejudice. *Boe*, 2014 S.D. 29, ¶ 20, 847 N.W.2d at 320. Unfair prejudice "results from the capacity of the evidence to persuade by illegitimate means." *State v. Birdshead*, 2015 S.D. 77, ¶ 63, 871 N.W.2d 62, 83 (citation omitted).

[¶26.] "To obtain a new trial, a defendant must prove not only that the trial court abused its discretion in admitting the evidence, but also that the admission resulted in prejudice." *Lassiter*, 2005 S.D. 8, ¶ 13, 692 N.W.2d at 175. If the other act evidence is "similar in nature and relevant to a material issue, and not substantially outweighed by its prejudicial impact[,]" it is admissible. *Boe*, 2014 S.D. 29, ¶ 20, 847 N.W.2d at 320 (quoting *Wright*, 1999 S.D. 50, ¶ 16, 593 N.W.2d at 800). "The degree of similarity required for other act evidence will depend on the purpose for which it is offered." *Wright*, 1999 S.D. 50, ¶ 16, 503 N.W.2d at 800.

[¶27.] Here, the other act evidence relates to two incidents between Evans and Kathy, one in 1993, after Evans and Kathy separated, and the other in 1994, during a time when Kathy had obtained a protection order against Evans. In regard to the 1993 incident, Kathy testified that Evans entered her home at night with a gun while she was sleeping, and after waking her up, shoved a blanket in her mouth, followed by a pillow over her face, to keep her quiet. She explained that he forced her to take off her clothes and tried, albeit unsuccessfully, to make her have sex with him. Ultimately, Kathy was able to calm Evans down and convince him to leave after telling him she was a terrible person and a rotten wife, that "she was so sorry it had come to this point," and that they would meet the next day. Thereafter,

she crawled on the floor over to a phone in case he was watching her through the windows and called 911.

[¶28.] The 1994 incident occurred when Evans showed up at one of their children's Christmas programs in violation of a protection order. Kathy called the sheriff, who escorted her outside where she noticed a mounted deer head in the back of her station wagon. Because of her fear of Evans, Kathy spent the night at a friend's house and when her friend drove her home the following morning, Kathy noticed Evans's vehicle parked outside her home. Her friend called law enforcement, and after the officers arrived, they found Evans, who was unconscious, locked inside Kathy's bedroom with a rifle, in what appeared to be a suicide attempt. Kathy explained that it was later determined that Evans had overdosed. A search of Evans's vehicle revealed mail addressed to Kathy that she had not yet received. Kathy also found writings by Evans in her home asking her to listen to what he had to say. When Kathy retrieved her station wagon later that day, she noticed that a family photograph she kept on her dash had been replaced with bullets.

[¶29.] In admitting Kathy's testimony as to these two incidents, the circuit court acknowledged that the acts against Kathy and against S.B. were separated by a lengthy period of time. However, the court found the situation with Kathy to be very similar to that which occurred with S.B. and concluded the evidence was relevant to prove motive and common plan or scheme. In its written findings of fact, the court found that the acts involved a similar victim, namely someone involved in a romantic relationship with Evans, who was subjected to threatening

and harassing behavior by Evans after taking steps to end the relationship. The court further determined that the acts toward Kathy and S.B. similarly involved breaking into a home at night and threatening sexual assault, a physical assault, and threats to kill. After acknowledging the evidence would be prejudicial to Evans's case, the court concluded that the probative value of the evidence was "not outweighed by any prejudicial effect[.]"[4]

[¶30.] As we indicated in *Wright*, when considering the admission of common plan or scheme evidence, "[u]nlike evidence of uncharged acts used to prove identity, the plan need not be unusual or distinctive; it need only exist to support the inference that the defendant employed that plan in committing the charged offense." 1999 S.D. 50, ¶ 18, 503 N.W.2d at 800 (citation omitted). "All that is required to show a common plan is that the" current acts and the other acts "'have sufficient points in common.'" *Id.* ¶ 19 (citation omitted); *see also State v. Medicine Eagle*, 2013 S.D. 60, ¶ 20, 835 N.W.2d 886, 893 (affirming a circuit court's admission of defendant's other acts to show "a common plan or scheme to kidnap, rape, and assault young girl victims . . . after isolating them by use of his deception,

---

4. In support of his contention that reversible error occurred here, Evans contends the circuit court admitted the other acts as propensity evidence. Evans isolates one sentence in the court's oral ruling following the pre-trial hearing wherein the court remarked, "It goes strictly, I think, to an individual's character." A review of the entire ruling, however, reveals that in its written findings of fact and conclusions of law, the court specifically identified that other act evidence "is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." SDCL 19-19-404(b)(1). In ruling that the two incidents with Kathy were admissible, the court identified the specific appropriate grounds upon which it relied, including motive and common plan or scheme. *See Boe*, 2014 S.D. 29, ¶ 20, 847 N.W.2d at 320 ("Only when other act evidence is offered to prove character is the evidence inadmissible.").

physical threats, and intimidation"). Further, the other act "evidence must demonstrate 'not merely a similarity in results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.'" *Wright*, 1999 S.D. 50, ¶ 19, 593 N.W.2d at 800–01 (citation omitted).

[¶31.] In regard to the admission of other acts to prove motive, we explained in *Boe*, that evidence of a prior act can "demonstrate the existence of a motive when there is a relationship between the victims." 2014 S.D. 29, ¶ 21, 847 N.W.2d at 321. Where such a relationship exists, "the motive is [typically] in the nature of hostility, antipathy, hatred, or jealousy." *Lassiter*, 2005 S.D. 8, ¶ 22, 692 N.W.2d at 178 (citation omitted).[5]

[¶32.] A review of the record shows sufficient similarity between Kathy and S.B. and between the crimes committed against them to support admission of the prior acts to prove both motive and common plan or scheme. Kathy and S.B. are members of the same class of victims—women who suffered domestic abuse at the hands of Evans. Both were involved in a relationship with Evans and sought and obtained protection orders after they ended the relationship. Despite the protection orders, Evans continued to harass, threaten, and intimidate both women by taking their mail and conveying disturbing messages in writing or by leaving items in

---

5.    Evans's reliance upon *Lassiter*, where a circuit court's admission of other acts was found to be erroneous, is misplaced. Lassiter was charged with assaulting his ex-girlfriend's *boyfriend*, and the other act evidence related to Lassiter's prior assault of a different former girlfriend after she attempted to end the relationship. 2005 S.D. 8, ¶ 11, 692 N.W.2d at 175. Unlike the facts here, the other acts in *Lassiter* did not involve similar victims or "substantial similarities" in the assaults. *See id.* ¶ 25, 692 N.W.2d at 179.

conspicuous places. Evans unlawfully entered each woman's house with a gun at night while each was sleeping. He gagged both women—Kathy with a blanket and pillow, S.B. with duct tape. Although he did not succeed in forcing Kathy to have sex with him, he attempted to do so; thus, the act with Kathy is similar to his coercion of S.B. to accomplish an act of sexual intercourse with her. After engaging in these acts toward both women, Evans attempted suicide.

[¶33.]       Further, Evans's conduct toward Kathy evinces the same motive that impelled him to commit the charged crimes against S.B.—to exert power and instill fear in an attempt to regain control of a relationship, and if that failed, to punish each woman for ending it. Evans carried out a similar plan to achieve these objectives with respect to both women. In addition, while not specifically delineated by the circuit court, the other act evidence was also admissible to prove intent. Here, for the crimes of kidnapping and burglary, the State was required to prove that Evans acted with specific intent. *See* SDCL 22-19-1 (removing or confining another person with a specified purpose); SDCL 22-32-1 (entering or remaining in an occupied structure with intent to commit a crime). Evans's prior acts toward Kathy were probative to show his similar intent when carrying out his acts toward S.B. *See State v. White*, 538 N.W.2d 237, 244 (S.D. 1995) (admitting other act evidence of a subsequent rape of another victim under similar circumstances to prove specific intent). Finally, because the crux of Evans's defense was that S.B. consented, the prior similar incidents with Kathy were highly probative in showing the absence of consent. *See id.* at 243–44; *see also State v Willis*, 370 N.W.2d 193,

198 (S.D. 1985) (admitting other act evidence of another rape under similar circumstances where consent is asserted as a defense).

[¶34.] Evans nevertheless contends that the acts pertaining to Kathy were too remote to be admissible, having occurred 27 years ago. On the contrary, "[w]e have steadfastly refused to adopt an inflexible rule on remoteness." *Wright*, 1999 S.D. 50, ¶ 24, 593 N.W.2d at 802. Instead, admission depends in part "on the nature of the prior acts" and remoteness must be considered with similarity. *State v. Most*, 2012 S.D. 46, ¶ 17, 815 N.W.2d 560, 565. "[T]he two concepts are so closely related; the remoteness of a prior crime takes on increased significance as the similarity between the prior crime and the charged offense [decreases]."[6] *Id.* (quoting *State v. Fisher*, 2010 S.D. 44, ¶ 28, 783 N.W.2d 664, 673). "Thus, a prior bad act, despite its remoteness, may still be relevant if it is strikingly similar to the charged offense. Conversely, less similarity may be required where the prior act is closer in time to the charged incident." *Id.* (citation omitted).

[¶35.] Because here, the prior acts with Kathy are "strikingly similar" to the charged offense against S.B., Evans has not established the circuit court abused its

---

6. This Court in *State v. Fisher* took the quoted sentence verbatim from an Indiana court of appeals decision. 2010 S.D. 44, ¶ 28, 783 N.W.2d at 673 (quoting *Fisher v. State of Indiana*, 641 N.E.2d 105, 109 (Ind. Ct. App. 1994)). We then restated this quoted language in *Most*, 2012 S.D. 46, ¶ 17, 815 N.W.2d at 565. However, it is apparent the Indiana court used the word "increases" at the end of the sentence when it meant "decreases." The error in word choice is evident in light of the Indiana court's subsequent two sentences (which are quoted by this Court above and in *State v. Fisher* and *Most*). Those two sentences explain the premise that remoteness is less significant when the prior act is strikingly similar to the charged offense. *See Fisher*, 641 N.E.2d at 109. To avoid further confusion when quoting from these cases, we have modified the quoted language here to reflect the obvious point being made.

discretion in admitting the evidence despite the remoteness between the prior acts and charged offenses. *Compare Boe*, 2014 S.D. 29, ¶ 25, 847 N.W.2d at 322 (sufficient similarity), *with Fisher*, 2010 S.D. 44, ¶¶ 28–30, 783 N.W.2d at 673–74 (lacking critical similarity). Likewise, Evans has failed to show that the circuit court abused its discretion when it found that the probative value of this evidence was not substantially outweighed by the danger of unfair prejudice. While the evidence was certainly unfavorable to Evans, there was nothing about this sort of evidence that had the capacity to persuade the jury by illegitimate means.

[¶36.] As to Evans's further claim that the circuit court abused its discretion when it refused his request to give a limiting instruction *prior* to Kathy's testimony, we have often commented that the potential for unfair prejudice can be alleviated by the giving of a limiting instruction. *See, e.g., Steichen v. Weber*, 2009 S.D. 4, ¶ 19, 760 N.W.2d 381, 391 (indicating that protection against unfair prejudice "emanates" from multiple sources including the giving of a limiting instruction upon request). Here, the circuit court denied defense counsel's request to give a limiting instruction *prior* to Kathy's testimony, indicating it was not the court's general practice. While some counsel may strategically decide not to request a limiting instruction prior to the admission of other act testimony to avoid calling undue attention to the unfavorable evidence, when a request for such an instruction is made, particularly by the defendant, we conclude that it is an abuse of discretion for a court to refuse the request.

[¶37.] However, in this case, the circuit court's error does not necessitate reversal. The court included a limiting instruction in the final instructions provided

to the jury prior to deliberations, and Evans has not identified how the court's refusal to give it at an earlier point in time prejudiced him. As we have previously held, when other act evidence has been correctly admitted, a limiting instruction given as part of the final instructions to the jury "fully protects a defendant's rights." *See State v. Rose*, 324 N.W.2d 894, 896 (S.D. 1982).

> ### 2. Whether the circuit court failed to follow statutory procedures during jury selection such that a structural or other reversible error occurred.

[¶38.]     Evans contends that several aspects of the circuit court's voir dire procedure substantially deviated from the jury selection process set forth in SDCL chapter 23A-20. In particular, Evans asserts the circuit court failed to follow SDCL 23A-20-6 when it summarily excused jurors on its own, rather than after counsel conducted voir dire and challenged the jurors for cause. He further contends the court failed to follow the dictates of chapter 23A-20 by not inquiring into whether any of the excused jurors' work-related issues could be accommodated or whether they could set aside any preconceptions and follow the court's instructions regarding the State's burden, the presumption of innocence, or the jury's role in deciding a case based on the evidence admitted at trial. Notably, none of these issues were raised by trial counsel below. Nevertheless, on appeal, Evans relies on *State v. Blem* for the proposition that the court's deviation from the jury selection statutes constitutes a structural error necessitating automatic reversal.[7] *See* 2000 S.D. 69, 610 N.W.2d 803.

---

7.     In *Blem*, we held the circuit court erred in granting, over the defendant's objection, the State's request made prior to voir dire to remove two

(continued . . .)

[¶39.] Under SDCL 23A-20-6, "[t]he *defense attorney* or the defendant, if appearing pro se, *and the prosecuting attorney* shall conduct examination of prospective jurors." *Id.* (emphasis added). However, the statute also provides that "[p]rior to the examination *the court* may conduct a *general examination* of the prospective jurors." *Id.* (emphasis added). SDCL chapter 23A-20 does not define what qualifies as *general examination*, but such inquiries would typically involve matters that would be applicable to any case, such as statutory disqualifications under SDCL 16-13-10, work or other related conflicts with the time commitments required, and health matters impacting the ability to serve.[8]

[¶40.] Here, the circuit court's case-specific examination of the prospective jurors in chambers addressed matters ordinarily handled during counsel's examination. Such matters included whether the specific nature of the charges at issue or the parties involved would make it impossible for the prospective jurors to

---

(. . . continued)

> prospective jurors for cause. 2000 S.D. 69, ¶ 24, 610 N.W.2d at 809. We concluded that the denial of the defendant's opportunity to examine the prospective jurors constituted a structural error because the court's substantial failure to comply with the jury selection statutes affected the framework within which the trial proceeded. *Id.* ¶¶ 29–30, 610 N.W.2d at 810. This Court has more recently recognized that "*Blem* does not stand for the proposition that every error in the jury selection process constitutes a structural error." *Miller v. Young*, 2018 S.D. 33, ¶ 19, 911 N.W.2d 644, 650 (distinguishing *Blem*).

8. We have previously noted that "[a]lthough the extent of the general examination permitted by the trial court is undefined by statute or prior caselaw of this Court, the trial court's discretion in conducting voir dire is limited by the right of the parties to have an impartial jury." *State v. Daniel*, 2000 S.D. 18, ¶ 11, 606 N.W.2d 532, 534.

be fair and impartial if selected.[9]  Nevertheless, nothing in chapter 23A-20 strictly forbids the parties from waiving the statutory procedure or the circuit court from asking case-specific questions, and Evans did not object to the court's process here.[10]  *See generally State v. Daniel*, 2000 S.D. 18, ¶ 13, 606 N.W.2d 532, 535 (acknowledging that "*[a]bsent agreement between the court and counsel*, voir dire of the jury is not the time for premature presentation of evidence, nor attempts at pre-instruction by attorneys *or the trial court*" (emphasis added)).

[¶41.]      Second, SDCL 23A-20-8 implies that a court may excuse a juror for cause when disqualifying grounds exist regardless of whether counsel first instituted a challenge for cause.  This statute provides: "At any time that cause for disqualifying a juror appears, the court shall excuse him and call another member

---

9.  In response to the court's questioning in chambers, while some jurors identified health concerns or scheduling issues because of work or vacation, many other jurors indicated familiarity with Evans's family or personal experiences with charges of the nature alleged against Evans.  Although trial counsel typically directs the examination on case-specific matters, a circuit court may also question a juror about such matters, and often must do so, to properly rule on challenges for cause.

10.  At the conclusion of a pretrial hearing just days before trial, counsel and the court went off the record to discuss the voir dire process and never made a record of what was discussed.  The lack of objection by counsel at trial to the court's voir dire process suggests that counsel and the court may have discussed this plan prior to commencing voir dire.  Further, when the court addressed the first prospective juror in chambers and the juror indicated familiarity with Evans's daughter, the court said, "It would be my intent to excuse.  Any objections?"  The State replied in the negative, and counsel for Evans replied, "No objection."  While the court did not ask counsel if either objected when it excused the other jurors, the court's initial invitation for objection further suggests that counsel and the court had agreed on this process.

of the panel to take his place in the jury box and on the clerk's list of jurors."[11]  *Id.*

Finally, while SDCL 23A-20-13.1 lists grounds upon which challenges for cause may

be taken by counsel, the statute does not indicate it is an *exclusive* list of grounds

upon which a juror can be excused by the court during voir dire.[12]

[¶42.]        Notably, although Evans identifies instances where, in his view, the

court's jury selection process deviated from chapter 23A-20, he does not identify in

what manner the court's process resulted in a *substantial* failure to comply with the

statutes, namely how the jury selection process *necessarily* rendered the trial

fundamentally unfair.  *See Miller v. Young*, 2018 S.D. 33, ¶ 14, 911 N.W.2d 644,

648; *Guthmiller v. Weber*, 2011 S.D. 62, ¶ 16, 804 N.W.2d 400, 406.  The process by

which the court examined the potential jurors did not deprive the State or Evans's

counsel of the opportunity to determine whether prospective jurors possessed beliefs

that "would cause them to be biased in such a manner as to prevent [Evans or the

State] from obtaining a fair and impartial trial."  *See Daniel*, 2000 S.D. 18, ¶ 11, 606

N.W.2d at 534 (citation omitted).  The court examined each juror in the presence of

counsel, and on two occasions while in chambers, the court, when requested,

---

11.    In *Blem*, we noted the intent behind SDCL 23A-20-8 "is that the trial court
       can remove a juror for cause at any time *during the examination*."  2000 S.D.
       69, ¶ 23, 610 N.W.2d at 808.

12.    It is a widely accepted practice, for example, for the court and counsel to
       agree to excuse jurors for circumstances such as work or family
       commitments, prearranged travel plans, medical appointments, or health
       conditions, despite the fact that these reasons are not enumerated in statute.

allowed counsel to ask further questions to demonstrate or negate juror bias. Therefore, Evans has not established structural error.[13]

[¶43.]    Evans further contends that the circuit court abused its discretion in excusing certain jurors and failing to excuse others. However, Evans did not object to any of the court's excusals during the examination of the prospective jurors in chambers. Moreover, Evans did not challenge the non-excused jurors for cause any time thereafter, despite having had the opportunity to further examine these jurors after voir dire resumed in the courtroom. Finally, both parties passed the actual jury for cause and Evans has not alleged that the twelve jurors who were selected and ultimately decided the case were biased. *See, e.g., First Bank of S.D. v. VonEye*, 425 N.W.2d 630, 633 (S.D. 1988) ("A party who fails to challenge prospective jurors for disqualification and passes them for cause waives any objection to their selection as jurors."); *accord Bland v. Davison Cnty.*, 1997 S.D. 92, ¶ 17, 566 N.W.2d 452, 458; *see also State v. Verhoef*, 2001 S.D. 58, ¶ 19, 627 N.W.2d 437, 442 (providing that to show prejudice, defendant must show that the actual jury was not

---

13.    After *Blem*, we recognized "[t]he United States Supreme Court has only found errors to be structural when there has been (1) a deprivation of the right to counsel; (2) a biased judge; (3) an unlawful exclusion of grand jurors of the defendant's race; (4) a deprivation of the right of self-representation at trial; (5) a deprivation of the right to a public trial; and (6) an erroneous reasonable doubt standard." *Guthmiller*, 2011 S.D. 62, ¶ 16, 804 N.W.2d at 406. We noted that "a constitutional error is either structural or it is not" and further recognized that "the Supreme Court has declined to follow a broader 'functional equivalent test,' because it would be inconsistent with the Court's categorical approach to structural errors." *Id.* (quoting *Neder v. United States*, 527 U.S. 1, 8, 119 S. Ct. 1827, 1833, 144 L. Ed. 2d 35 (1999)). Since *Blem*, we have declined to find structural error when the error does not fit within one of the six categories. *State v. Arguello*, 2015 S.D. 103, ¶ 6, 873 N.W.2d 490, 493.

impartial). In any event, it is well settled that the circuit "court has broad discretion in determining juror qualification" and reversible error exists only when the defendant shows "[a]ctual, material prejudice[.]" *Daniel*, 2000 S.D. 18, ¶ 16, 606 N.W.2d at 535 (citation omitted); *see also State v. Moeller*, 2000 S.D. 122, ¶ 28, 616 N.W.2d 424, 435. Thus, even if some of the court's excusals followed what was admittedly a very perfunctory examination, reversal is unnecessary because Evans has not demonstrated prejudice.

### 3. Whether the court erred in denying Evans's motion to suppress.

[¶44.] Evans asserts that the state law enforcement officers investigating this case were without authority to remove his vehicle from the Reservation or to search his room at a hotel located on the Reservation. He contends the state officers were required to have a tribal warrant or a state/tribal compact in order to execute a state court warrant on property within an Indian reservation.[14] We review questions of jurisdiction de novo. *State v. Spotted Horse*, 462 N.W.2d 463, 465 (S.D. 1990).

[¶45.] Evans contends that resolution of this case is controlled by *Spotted Horse*, 462 N.W.2d 463 and *State v. Cummings* (*Cummings I*), 2004 S.D. 56, 679

---

14. Evans also argues the circuit court issued clearly erroneous findings of fact. *See, e.g., State v. Rolfe*, 2018 S.D. 86, ¶ 10, 921 N.W.2d 706, 709–10 (indicating we review a court's findings on a suppression motion for clear error). In particular, he claims the court found that "all officers" were cross-deputized and members of the joint task force and found that Agent Garland "worked" with an Assistant United States Attorney in preparation of the warrant. Notably, Evans refers solely to the court's oral statements at the suppression hearing when relating what the court *found*. But those oral statements are not in the court's written findings of fact, and Evans does not contend that any of the court's written findings of fact are clearly erroneous.

N.W.2d 484. While this appeal was pending, this Court issued a decision abrogating *Spotted Horse* and *Cummings I* in so far as those decisions "incorrectly conflated jurisdictional principles with tribal sovereignty and individual rights afforded by the Fourth Amendment."[15] *State v. Cummings* (*Cummings II*), 2021 S.D. 4, ¶ 24, 954 N.W.2d. 731. However, *Cummings II* did not address the question posed here—whether state officers may "execute formal state process or non-consensual enforcement in Indian country."[16] *See id.* ¶ 22, 954 N.W.2d at 738. Rather, *Cummings II* addressed a consensual interview of a tribal member by a state officer on the reservation. We therefore examine *Spotted Horse* and *Cummings I* in light of the issue Evans raises in this appeal.

[¶46.] In *Spotted Horse*, a Mobridge city police officer pursued the defendant, an enrolled member of the Standing Rock Sioux Tribe, while he drove from the city

---

15. In *Cummings II*, the defendant relied on *Spotted Horse* and *Cummings I* in arguing that state officers had no authority to engage in any law enforcement activity in Indian country without authorization from tribal authorities. 2021 S.D. 4, ¶ 10, 954 N.W.2d at 735. The Court examined both *Spotted Horse* and *Cummings I*, and ultimately concluded that *Nevada v. Hicks*, 533 U.S. 353, 366, 121 S. Ct. 2304, 2313, 50 L. Ed. 2d 398 (2001) controlled, contrary to what this Court said in *Cummings I*. We then adopted the reasoning in *Hicks* "recognizing the ability of state officers to lawfully enter Indian country to investigate 'violations of state law occurring off the reservation[.]'" *Id.* ¶ 19, 954 N.W.2d at 737 (quoting *Hicks*, 533 U.S. at 366, 121 S. Ct. at 2313). We further concluded that this includes "state law enforcement officers' authority to enter into Indian country to investigate state crimes alleged to have been committed by Indians off the reservation." *Id.*

16. *Cummings II* also expressly declined to decide whether, when applying *Hicks*, the actions of the state law enforcement officers addressed in *Spotted Horse* and *Cummings I*—arresting tribal members suspected of state law violations in Indian country—infringe on tribal sovereignty. 2021 S.D. 4, ¶ 23 n.5, 954 N.W.2d at 739 n.5.

limits into Indian country with expired license plate registration tags. 462 N.W.2d at 464. The defendant eventually pulled his vehicle into a driveway within reservation boundaries, and the officer arrested the defendant. The officer transported the defendant back to Mobridge where he was charged in state court with driving under the influence. The defendant moved to suppress the evidence, claiming in part that he was illegally removed from Indian country. The court denied the motion, and on appeal, we determined the state officer did not have jurisdiction in Indian country and the State could not exercise partial jurisdiction over the highways running through reservations. *Id.* at 467.

[¶47.] In a similar scenario in *Cummings I*, a state law enforcement officer observed the defendant, a member of the Oglala Sioux Tribe, speeding and crossing the centerline of a highway in Fall River County outside of Indian country. 2004 S.D. 56, ¶ 2, 679 N.W.2d at 485. The officer activated his emergency lights and pursued the defendant, who refused to stop. The officer pursued him until both vehicles entered the Pine Ridge Indian Reservation, where the defendant eventually stopped. He was later charged in state court for speeding and eluding. The defendant moved to suppress the evidence and the circuit court granted his motion, relying on *Spotted Horse*, but only as to the evidence obtained after the officer entered the reservation. *Id.* ¶ 5.

[¶48.] On appeal in *Cummings I*, the State argued that *Nevada v. Hicks*, 533 U.S. 353, 121 S. Ct. 2304, 150 L. Ed. 2d 398, overruled *Spotted Horse*. In *Hicks*, the United States Supreme Court examined "whether a tribal court may assert jurisdiction over civil claims against state officials who entered tribal land to

execute a search warrant against a tribe member suspected of having violated state law outside the reservation." 533 U.S. at 355, 121 S. Ct. at 2308. In examining this question, the Court reviewed its past Indian law cases and the governing principles discussed therein. The Court noted that its prior decisions have suggested that state law enforcement officers have the authority "to enter a reservation for . . . enforcement purposes" when addressing crimes committed off the reservation. *Id.* at 363, 121 S. Ct. at 2312. According to the Court, "[t]his makes perfect sense, since, as we explained in the context of federal enclaves, the reservation of state authority to serve process is necessary to 'prevent [such areas] from becoming an asylum for fugitives from justice.'" *Id.* at 364, 121 S. Ct. at 2312 (quoting *Fort Leavenworth R. Co. v. Lowe,* 114 U.S. 525, 533, 5 S. Ct. 995, 999, 29 L. Ed. 264 (1885)).

[¶49.]     The United States Supreme Court further explained "that tribal authority to regulate state officers in executing process related to the violation, off reservation, of state laws is not essential to tribal self-government or internal relations—to 'the right to make laws and be ruled by them.'" *Id.* at 364, 121 S. Ct. at 2313. The Court also observed that "[t]he State's interest in execution of process is considerable, and even when it relates to Indian-fee lands it no more impairs the tribe's self-government than federal enforcement of federal law impairs state government." *Id.*

[¶50.]     Notably, both *Cummings I* and *Spotted Horse* involved state law enforcement exercising jurisdiction on a reservation *against a tribal member*. Despite the fact that Evans is asserting that "the tribal sovereignty issue" is "at the

heart of [his] argument," he nevertheless claims his status as a non-Indian is not determinative.[17] In his view, it does not matter that he is a non-Indian because a decision condoning state law enforcement's conduct here "would subvert tribal sovereignty over places and things on the reservation."

[¶51.] On the contrary, as the Court in *Hicks* explained, the state's execution of a state warrant on a reservation for the violation of state laws occurring off the reservation does not impair the tribe's right to self-govern. *See* 533 U.S. at 364, 121 S. Ct. at 2312. If such is the case with respect to Indian defendants, then surely this same concept holds true when, like here, the state warrant authorizes the search and seizure of property owned by a non-Indian for crimes committed against another non-Indian outside the reservation. Evans has not directed this Court to a single case supporting the contrary proposition.

[¶52.] Although *Cummings II* was not decided at the time the circuit court denied Evans's motion to suppress, allowing the search and seizure of non-Indian property, here, related to off-reservation crimes is in accord with *Hicks*, and now

_____

17. Evans cites *State v. Madsen*, to support his claim that his status as a non-Indian is immaterial. 2009 S.D. 5, 760 N.W.2d 370. In *Madsen*, a non-Indian filed a motion to suppress evidence seized pursuant to a warrantless search of his hotel room on the reservation by hotel security guards. The circuit court denied suppression, concluding the tribal hotel security guards were private actors and not subject to the prohibition against unreasonable searches and seizures. *Id.* ¶ 9, 760 N.W.2d at 373. On appeal, we reversed, concluding the security officers "were Tribal government agents whose conduct was limited by the constraints of the Indian Civil Rights Act." *Id.* ¶ 31, 760 N.W.2d at 381. Although the non-Indian status of the defendant in *Madsen* did not preclude the application of the Indian Civil Rights Act to protect his rights, here, in contrast, Evans is relying upon tribal sovereignty principles—which hinge upon Indian status or tribal interests—to support a jurisdictional challenge to state officers' authority to seize a non-Indian's property. Thus, Evans's reliance on *Madsen* is misplaced.

with *Cummings II*. As the Court in *Hicks* explained, "Nothing in the federal statutory scheme prescribes, or even remotely suggests, that state officers cannot enter a reservation (including Indian-fee land) to investigate or prosecute violations of state law occurring off the reservation." 533 U.S. at 366, 121 S. Ct. at 2313. As we explained in *Chase Alone v. C. Brunsch, Inc.*, albeit in a civil adjudicatory context, "[t]o determine jurisdiction in accordance with the infringement test, we assess the interests of the tribal and federal governments 'on the one hand, and those of the State, on the other.'" 2019 S.D. 41, ¶ 15, 931 N.W.2d 707, 711 (citation omitted). In this regard, whether the action involves Indians or tribal property and whether the action "occurred within the confines of Indian country are highly relevant in determining whether the exercise of jurisdiction will infringe on tribal self-government." *Id.* Here, neither Evans nor S.B. are member Indians, the crimes did not occur within the confines of Indian country, and the property seized did not belong to a tribal member, thus negating any possible conclusion that the exercise of jurisdiction by the state officers would infringe on tribal self-government.[18]

[¶53.]        Even if we presume the Tribe has an interest in all law enforcement activity occurring within reservation borders, the state officers here respected such an interest, not only by way of notification, but also by seeking the assistance of tribal law enforcement. In fact, tribal officers were present during the execution of

---

18.    Notably, Evans acknowledges that the Tribe had no jurisdiction over him for the crimes he committed off reservation and clarifies in his appellate briefs that he is not challenging the validity of his arrest. Given that Evans was arrested on a state warrant by state law enforcement officers while on the reservation, it is hard to discern any material distinction between the arrest warrant and the search warrants at issue.

the arrest warrant and were invited to assist in the execution of the search warrant. Therefore, Evans's suggestion that "tribal sovereignty" principles were ignored in this case is simply misplaced. He has not identified in what way the State's execution of the search warrants here infringed on the right of the Tribe to make its own laws and be ruled by them. The circuit court did not err in denying Evans's motion to suppress.

### 4. Whether the court abused its discretion in admitting Agent Goble's testimony.

[¶54.] Evans asserts the circuit court abused its discretion in admitting Agent Goble's opinion testimony. He contends that without adequate foundation establishing Agent Goble had the requisite qualifications to assess S.B.'s injuries and opine on what caused them, or to indicate whether what he had observed was consistent with the mechanism of injury S.B. reported, this testimony should have been excluded. Evans further claims that Agent Goble's opinion testimony invaded the province of the jury, particularly its role in assessing "whether [S.B.'s] story added up." Therefore, he asserts the agent's testimony was highly prejudicial because it infringed upon the jury's duty to resolve the conflicts in the evidence.

[¶55.] We review a court's decision to admit or deny witness testimony for an abuse of discretion. *State v. Miller*, 2014 S.D. 49, ¶ 11, 851 N.W.2d 703, 706. Here, Agent Goble explained that he generally takes his own photographs before he interviews a witness as an investigative tool to corroborate a person's statements. In regard to S.B., Agent Goble testified that he took pictures of anything "that was an abrasion, a scratch, a mark, a bruise" and then conducted an interview of S.B., wherein she described in detail what had happened. The following exchange

occurred between the State and Agent Goble after he described the photographs of

S.B. and the details of her interview:

> State: You stated, and when you began your testimony, that you interview a subject then take pictures to corroborate the interview?
>
> Agent Goble: That's definitely one of the things I do to corroborate what they say.
>
> State: And in this case you took pictures?
>
> Agent Goble: Yes.
>
> State: And you also interviewed the victim?
>
> Agent Goble: Correct.
>
> State: And in your opinion did the pictures corroborate her story?
>
> Counsel for Evans: Objection; invades the province of the jury.
>
> Court: Overruled.
>
> Agent Goble: *There was corroboration in the location where she said she was taped and that the injuries she had could possibly be consistent with being dragged through a house and out a house.*

(Emphasis added.)[19]

[¶56.]    A review of Agent Goble's statements does not support Evans's

argument that the State was required to establish more foundation prior to eliciting

this testimony.  Under SDCL 19-19-701, a witness not testifying as an expert may

form an opinion that is: "(a) Rationally based on the witness's perception; (b)

---

19.    The court did sustain defense counsel's objection (alleging an improper "ultimate conclusion") when the prosecutor later asked Agent Goble whether S.B.'s story "was corroborated by the evidence [he] collected."

Helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) Not based on scientific, technical, or other specialized knowledge within the scope of § 19-19-702." *See State v. Condon*, 2007 S.D. 124, ¶ 29, 742 N.W.2d 861, 870. Agent Goble did not offer an expert opinion that S.B.'s injuries were caused in the manner she alleged, nor did he offer an opinion that S.B. is credible per se. *See generally State v. Engesser*, 2003 S.D. 47, 661 N.W.2d 739 (finding troublesome a witness's opinion testimony regarding a defendant's untruthfulness). Rather, he testified that the tape residue on S.B.'s body and her injuries (documented by pictures he took) "could *possibly* be consistent" with her description of the events in question. (Emphasis added.) Such observations did not rise to the level of vouching for a witness's credibility, and were admissible by a lay witness, when, as here, they were based upon the witness's own observations and were not dependent on scientific, technical, or specialized knowledge. The circuit court did not abuse its discretion in allowing Agent Goble's testimony.

[¶57.]     Affirmed.

[¶58.]     JENSEN, Chief Justice, and, KERN and SALTER, Justices, and GILBERTSON, Retired Chief Justice, concur.

[¶59.]     MYREN, Justice, not having been a member of the Court at the time this action was submitted to the Court, did not participate.