#30443-r-PJD & SRJ
**2025 S.D. 55**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

    v.

DION NOEL BORDEAUX,                       Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE ROBERT A. MANDEL
Retired Judge

* * * *

KYLE BEAUCHAMP of
Colbath and Sperlich
Rapid City, South Dakota          Attorneys for defendant
                                  and appellant.


MARTY J. JACKLEY
Attorney General

PAUL S. SWEDLUND
Solicitor General
Pierre, South Dakota              Attorneys for plaintiff
                                  and appellee.

* * * *

ARGUED
OCTOBER 1, 2024
OPINION FILED **10/15/25**

#30443

DEVANEY, Justice and JENSEN, Chief Justice

**[¶1.]** **Justice DeVaney delivers the opinion of the Court on Issue One. Chief Justice Jensen delivers the opinion of the Court on Issue Two.**

**[¶2.]** **DEVANEY, Justice, writing for the Court on Issue One.**

[¶3.] Dion Bordeaux was convicted by a Pennington County jury of first-degree murder in violation of SDCL 22-16-4(1) for shooting his girlfriend. He was sentenced to life imprisonment without the possibility of parole. At trial, the circuit court allowed other act evidence stemming from a prior aggravated assault Bordeaux committed against a different victim to be presented to the jury. Bordeaux appeals, contending the circuit court abused its discretion in admitting this evidence. He further claims he was prejudiced by the admission and seeks a reversal and remand for a new trial.

## Factual and Procedural Background

[¶4.] In the early morning hours of January 1, 2020, Jeanette Jumping Eagle died from a single gunshot wound to her forehead. Jeanette had spent the preceding New Year's Eve with her boyfriend, Bordeaux, his brother, Giovanni Bordeaux, and some of her family members and friends in a hotel room she had rented at the Microtel Inn in Rapid City, South Dakota. While others came and left the hotel room throughout the evening, only Bordeaux and Giovanni were in the room at the time of Jeanette's death.

[¶5.] According to Giovanni's trial testimony, Bordeaux and Jeanette had been arguing throughout the night, and it appeared to Giovanni that the couple was on the verge of a break-up. He testified that the two were acting "childish" and

-1-

calling each other names, which made him feel uncomfortable. Giovanni had made arrangements with his coworkers to pick him up at the hotel after their shifts ended. While waiting in the hotel room for them to arrive, Giovanni went into the bathroom. As he was urinating, he heard a loud bang. He then finished, zipped up his pants, and opened the bathroom door. When he did so, he smelled gunpowder and observed Bordeaux standing "next to the wall." Giovanni described Bordeaux as "freaking out" and when he asked him what had happened, Bordeaux responded, "I don't know, I don't know, I don't know."

[¶6.]     Giovanni testified he caught a glimpse of Jeanette on the couch bleeding from her head, but his view was obstructed by Bordeaux, who was standing a foot or two in front of her. He could not see what, if anything, Bordeaux was doing with his hands at that time, but he did recall Bordeaux thereafter going into the bathroom. He did not remember seeing a firearm on or near Jeanette. He explained that the two of them were panicking, and after Bordeaux came out of the bathroom, he told Giovanni "to run, to leave the room." They then left the hotel room together and Giovanni recalled Bordeaux stating that he was going to call the police. Giovanni said that they left the hotel and began walking and running down Lacrosse Street toward several retail businesses. Giovanni testified that Bordeaux kept repeating "I'm sorry" and also stated, "I fucked up."

[¶7.]     They eventually split up, and Bordeaux stopped near the Runnings store and called 911. While breathing hard and crying, Bordeaux told the 911 dispatcher that his girlfriend "just shot herself." After the dispatcher asked him to repeat himself, he stated: "I broke up with her and said I'm leaving and she shot

herself. She had a gun." The dispatcher asked how he knew she shot herself if he was leaving, and Bordeaux responded, "I heard it, I was going out the door and heard a loud noise." Bordeaux gave the hotel room number to the dispatcher and also explained his location on North Lacrosse Street.

[¶8.]     When law enforcement officers arrived at the hotel, they found Jeanette, deceased, sitting in a slumped position on the couch with a gunshot wound above her right eyebrow. There was a large pool of blood, mostly to her right side, on the right arm of the couch and the cushion underneath her. There was a 9-millimeter Ruger handgun on her lap and her right hand was lying over the bottom of the grip. Jeanette's cell phone was underneath her right wrist, resting partially on the upper side of her right leg. A charging cord was attached to the phone and plugged into a charger, and part of the cord was wrapped around the little finger of Jeanette's right hand.

[¶9.]     Meanwhile, other police officers found Bordeaux standing on Lacrosse Street near Runnings. Officer Matthew Husfeldt approached him, with his body camera activated, and asked him to explain what happened. Bordeaux told the officer that he and Jeanette got into a fight and he broke up with her. He explained that when he was walking out the door, he heard a loud bang that sounded like a gunshot, after which he and his brother took off running. Officer Husfeldt asked him if his girlfriend had a history of suicidal tendencies and Bordeaux told him that they had only been dating a few months. He stated that she said she would do this if he left her, but he did not think she would. He further explained that they were fighting because he told her to stop drinking. He told the officer that she gets

violent when drunk and claimed she was pushing him around that evening. According to Bordeaux, when he told Jeanette he was going to leave, she said, "Fuck you, leave me then." Then, while he was by the bathroom door telling Giovanni they should go, he said he heard the loud noise and thought she had shot at him, so he told his brother, "Let's go, let's go." Bordeaux explained that after they realized she was not chasing them, he told Giovanni to go home. He also told the officer that Jeanette always had a gun in her purse or her car.

[¶10.] At numerous times during this discussion with Officer Husfeldt, Bordeaux would lie face down in the grass next to the sidewalk or would grab handfuls of grass, and he intermittently appeared to be crying. He asked the officer several times if Jeanette was okay. When Officer Husfeldt told him she was deceased, after a long pause he stated, "I didn't think she'd do that." He then asked for water, but before the officer brought him a bottle of water, Bordeaux walked over to a pile of snow and put a handful of snow in his mouth.

[¶11.] Bordeaux agreed to travel with law enforcement to the police station for a formal interview. When requested, he gave Officer Husfeldt his phone. Prior to going to the police station, another officer asked him to submit to a preliminary breath test. Once at the station, police learned of an active arrest warrant for Bordeaux pertaining to an aggravated assault that occurred in September 2019 in Lincoln County and he was arrested on that charge.[1] Bordeaux then requested a

---

1. This assault is the other act at issue in this appeal. According to testimony elicited at trial, Bordeaux pled guilty to this assault and was convicted.

lawyer, so law enforcement did not interview him further at that time regarding Jeanette's shooting.

[¶12.] At the Public Safety Building, a search warrant was executed by Bincy Thankachan, a forensic examiner with the Rapid City Police Department, to collect Bordeaux's clothing, swabs from his hands to test for gunshot residue (GSR), and buccal swabs from the inside of his mouth and his hands for DNA analysis. Thankachan noticed what appeared to be blood on Bordeaux's sweatpants and jacket. Thankachan collected similar evidence from Giovanni.

[¶13.] Law enforcement officers also obtained warrants authorizing a search of the hotel room and Jeanette's vehicle, and the seizure of any evidence related to the shooting. Inside the hotel room, officers observed empty alcohol containers, a scale, and plastic baggies containing what appeared to be marijuana or controlled substances on the countertop. They also observed a 9-millimeter cartridge case on the floor about two or three feet from Jeanette's foot. There was what appeared to be faint blood droplets and streaks in the bathroom sink, a blood drop on the bathroom floor, a blood smear on the door frame leading into the bathroom, a spot of blood on the wall across from the couch, and another on the wall about three feet above Jeanette's head. Upon closer examination of Jeanette, Detective Daniel Trainer noted that while there was blood on the top of her right hand and on the sleeve of her coat, there was a void between her sleeve and her hand where there was no blood.

[¶14.] Prior to the collection of any evidence, Thankachan, who had also traveled to the hotel, took pictures of the room, the evidence that was later

collected, and of Jeanette. After the pictures were taken, Detective Justin Gizzi examined the gun found in Jeanette's lap. He testified that when he picked up the gun and attempted to pull the slide back to clear the chamber, the slide would not move. He then discovered that the gun's safety mechanism was on. After disengaging the safety, he removed the magazine and the live round in the chamber. Detective Gizzi then spoke with all emergency and investigative personnel in the room and confirmed that nobody had manipulated the gun before he touched it.

[¶15.] Thankachan collected the 9-millimeter gun, the cartridge case from the floor, and Jeanette's cell phone and the charging cord that was attached to it.[2] She also took swabs of the blood stains observed throughout the room and, before Jeanette's body was removed from the room, Thankachan swabbed Jeanette's hands for GSR testing.

[¶16.] In Jeanette's vehicle, officers found a partially empty case of 9-millimeter ammunition, a semi-automatic gun holster, and five live rounds in the center console. They also found a digital scale and baggies containing what appeared to be a controlled substance. Detective Trainer spoke with a hotel

---

2. Thankachan initially testified on direct examination that she collected the 9-millimeter gun from Jeanette's lap, removed the magazine, and packaged these items for transport. She later agreed, on re-direct examination, that if Detective Gizzi testified he was the one who secured and cleared the gun and this is related in his report, she would have no reason to dispute this fact. She stated that is often how things are done at a crime scene. She further explained that these events occurred a couple years ago and clarified that the reference in her report regarding her "collection" of the gun referred to the fact that she was the one who transported it and placed it into evidence.

employee and obtained security camera footage of the hallway outside the hotel room. The video shows Bordeaux and Giovanni casually walking out of the room.

[¶17.] Thankachan was present at the autopsy performed by Dr. Don Habbe, a forensic pathologist, the following day. There, she collected additional evidence including bullet fragments Dr. Habbe recovered from Jeanette's skull. During the autopsy, Thankachan photographed the entrance wound on Jeanette's forehead using a trajectory rod to show the downward angle of the wound. Dr. Habbe determined that Jeanette died from a single gunshot wound to her forehead and concluded, based on the stippling around the wound, that the gun was not in contact with her forehead. Rather, it was fired from a short distance away.

[¶18.] On January 16, 2020, Bordeaux was interviewed again by law enforcement at the Minnehaha County Jail, where he was being held on the unrelated aggravated assault charge. Detective Trainer began the interview by telling Bordeaux that after gathering and examining the evidence, law enforcement had questions regarding what happened the night Jeanette died. He asked Bordeaux to explain it again. Bordeaux then gave a different account of what occurred that night.

[¶19.] Bordeaux stated that they were drinking and he was going to leave the hotel room, but Jeanette started getting mad. Giovanni was getting picked up and Bordeaux asked to go with him. Jeanette then said, "You aren't gonna leave me, are ya?" According to Bordeaux, his response was "Yea, I'm gonna leave," after which she stated, "Fuck you then, I'll just die." Bordeaux said he then heard a loud noise and walked over to her and saw her lying back with a bullet hole in her head.

He tried shaking her and was saying, "Baby, baby." He told Detective Trainer that he did not know what to do after that and was scared. He said that Jeanette sold drugs and had them in the room, so he grabbed his jacket and took off running. He then realized that he could not just leave her, so he called the cops.

[¶20.] After this account, the detective told Bordeaux that evidence at the scene indicated that Bordeaux did more than what he just reported. Bordeaux then explained that he held Jeanette's head in his hands and was moving her around while trying to wake her up. The detective asked him what happened to the gun and Bordeaux said, "I don't know, it was right there," and when asked where, he stated, "Like, in her lap or something." He stated he went into the bathroom and washed blood off his hands and then took off because he was in shock. The detective asked him if he touched the gun and he said he had shot it earlier that night when they were driving somewhere near the train tracks by Walmart. He did not say that he had touched it in the hotel room.

[¶21.] On September 9, 2020, Bordeaux was indicted on one count of first-degree murder in violation of SDCL 22-16-4(1), a Class A felony, alleging that he killed Jeanette with a premeditated design.[3] In addition to other pretrial motions,

---

3. The indictment also named Giovanni as a codefendant and charged him with two alternative counts of being an accessory to a crime in violation of SDCL 22-3-5(4). He later entered into an immunity agreement with the State in which he agreed to make a proffer of information regarding the events surrounding Jeanette's death. In exchange for his agreement to provide truthful information and testify against "any other implicated person," the State agreed to provide him immunity from any charges, including being an accessory to, or aiding and abetting, crimes of violence, and misprision of a felony. Giovanni testified at trial that his charges were dismissed in December 2020.

the State filed a notice of intent to admit other act evidence. Relevant here, the State submitted a proffer regarding the aggravated assault for which Bordeaux was arrested the morning after Jeanette's shooting. This assault occurred in September 2019 when Bordeaux was visiting his distant cousin and friend, Kane Marshall, who lived with his girlfriend, Melissa Herrboldt, in Harrisburg, South Dakota.[4]

[¶22.]      The State's proffer, which included attached law enforcement reports, stated that Bordeaux and Marshall were drinking and playing chess and card games that evening while Herrboldt was in a back bedroom. According to Marshall, Bordeaux then unexpectedly pulled out a knife and attacked him, stabbing him multiple times in his chest, back, and arm. Marshall was able to subdue him by pinning him down.[5] Herrboldt, who heard the commotion, came out of her bedroom and found Marshall, who was bleeding, on top of Bordeaux. Bordeaux had a knife in his hand but Herrboldt convinced him to drop it, after which Bordeaux started apologizing to Marshall. Herrboldt's neighbor drove Marshall and Bordeaux to the hospital but Bordeaux immediately left when he saw the police. According to the

---

4.    The State also noticed its intent to offer another incident that occurred in December 2019 and was witnessed by Jeanette's twelve-year old niece who observed a violent physical altercation between Bordeaux and Jeanette when they were staying at her house. She reported seeing Bordeaux grabbing Jeanette by the shoulders and violently pushing her into the bathroom, yelling at her, and placing a knife against Jeanette's body. The niece refused to testify at the motion hearing and the State asked the circuit court to hold this part of the State's motion in abeyance, but the State did not thereafter reoffer this evidence.

5.    Marshall did not testify at either the motion hearing or at trial; only Herrboldt testified. But Marshall's account and the accompanying law enforcement reports were provided to the circuit court in the State's written proffer in support of its motion to admit this other act evidence.

police reports, when Marshall was initially brought to the hospital, he told medical staff that he had just fallen. Shortly thereafter, he told an officer that what happened was an accident. Marshall later told police that he and Bordeaux were "having words" but he could not recall what the argument was about. He stated that the argument was not physical until Bordeaux pulled out the knife.

[¶23.]    In its notice of intent to use the other act evidence, the State asserted that the evidence would be relevant to show intent and common scheme or plan, arguing that sufficient similarities existed between Bordeaux's actions on the night Jeanette was shot and this prior act, which the State characterized as follows:

> [T]he Defendant was drinking alcohol; the victim was also drinking alcohol; the victim had a close relationship with the Defendant; the Defendant and the victim were hanging out alone at the time of the assault; a third party was in a nearby room; there was a verbal argument; during the argument, the Defendant suddenly and unexpectedly attacked the victim; the Defendant attacked with a deadly weapon; the Defendant showed an intent to kill; the third party rushed into the room; with the third party present, the Defendant became contrite; the Defendant cradled both victims; the Defendant participated in a cover-up of the crime; and the Defendant fled the crime scene.

In opposition, Bordeaux argued that the September 2019 assault against Marshall is not admissible because there is no case law supporting the State's claim that cousins and romantic partners are similar victims. He further asserted that the State failed to correlate how the events of the two acts were similar to each other.

[¶24.]    The circuit court held an evidentiary hearing in November 2022 on the motion to admit this other act evidence. Herrboldt testified at this hearing and provided details aligning with what the State had set forth in its written proffer filed with the circuit court.

[¶25.] In May 2023, the circuit court entered a written order granting the State's motion to use the other act evidence pertaining to the September 2019 assault to prove Bordeaux's intent. The court reasoned that the prior act involved sufficiently similar victims and crimes, stating:

> In both the charged offense and the incident of September 2019, Defendant is alleged to have been drinking alcohol with a victim with whom he had a close, even familial, relationship. In both instances the Defendant and victims are alleged to have been alone together before [an] argument ensued resulting in an unsuspected, violent attack by the Defendant.

Citing *State v. Smith*, 1999 S.D. 83, ¶ 19, 599 N.W.2d 344, 349–50, the court further considered the availability of other evidence to prove the charged crime and concluded that the probative value of the evidence "may be heightened given the lack of eyewitnesses to the charged offense" here. Finally, the court concluded the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.

[¶26.] A five-day jury trial commenced on May 30, 2023. Consistent with the information related above, the State presented testimony from Giovanni, Dr. Habbe, and several police officers, detectives, and forensic examiners who collected and examined the evidence from the crime scene.

[¶27.] The exhibits admitted at trial included photographs that law enforcement took of the hotel room, Jeanette's body on the couch, the 9-millimeter gun, cell phone and attached charging cord, and the blood drops and stains in the room. Photos taken at Jeanette's autopsy showing the wound pathway, and the blood stains on her hands were also admitted, along with the 9-millimeter handgun, the clothes Bordeaux was wearing that evening, and several forensic reports. In

addition, the jury heard the recordings of Bordeaux's 911 call and of his two interviews with law enforcement in which he provided differing versions of what occurred in the hotel room. The jury also viewed the hotel security camera footage of the hallway outside Jeanette's hotel room. This footage depicts Bordeaux exiting the hotel room and calmly walking down the hallway with his hands in his pockets, followed by Giovanni, who came out of the room and then stopped and appeared to check the door to make sure it was locked. Giovanni then walked calmly behind Bordeaux as they left the building.

[¶28.] Dr. Habbe testified regarding his observations while performing the autopsy, including the stippling (small spots) around Jeanette's forehead wound from which he concluded that the tip of the gun's barrel was not in contact with her skin surface. When explaining what causes stippling, he stated that when the barrel of a gun is against the skin when fired, the smoke and unburned powder particles go into the wound. But if the barrel is "back a little bit," the unburned particles get embedded on the skin surface. He therefore characterized Jeanette's injury as a "near contact gunshot wound" meaning that the gun was a short distance away when it was fired.

[¶29.] Dr. Habbe also described the pathway of the bullet, explaining that, after entering Jeanette's forehead just above her right eyebrow, the bullet travelled in a downward straight path toward the back of her skull without any deviation to the right or left and did not exit Jeanette's head. Dr. Habbe concluded that Jeannette died from the single gunshot but did not offer an opinion as to the manner of death. He explained that the manner of death—whether by homicide,

suicide, or accident—"is based a lot on the investigation" and determined by others who assess the circumstances of the case.

[¶30.]     The State further elicited general testimony from Dr. Habbe about what he typically observes at an autopsy in cases involving suicides by gunshot. He explained that there are exceptions to every rule but noted that, "if you look at all of the gunshot wound suicides, the gun is typically a contact wound, meaning that most often the gun is placed right up against the skin surface." He also noted that the temple is the most common placement of the gun, but other locations could include the mouth, beneath the chin, or mid-forehead. When asked how long it would take for a person shot in the brain to lose motor function, he stated that with a gunshot wound like Jeanette's, one would "almost immediately" be unconscious, and while there might be some involuntary movement, "they are not going to move their arms."

[¶31.]     Kristina Fryer, a forensic analyst, discussed the serology and DNA results pertaining to the swabs taken from the hotel room, Bordeaux's clothes, and the 9-millimeter handgun. The blood stains on the hotel walls and the drop under the bathroom sink contained Jeanette's DNA. The transfer blood stain located on the bathroom door frame and the diluted blood stains in the sink contained DNA from two individuals, the major contributor being Jeanette, and the minor contributor being a male, but further comparisons could not be made as to the minor contributor. Swabs from the grip of the gun and the gun's slide also contained a mixture of DNA, with the major contributor being Jeanette and the minor partial DNA profile indicating the presence of male DNA. Fryer then

conducted further testing on these swabs from the grip and the slide and determined that this partial profile contained a mixture of DNA from two male individuals. Bordeaux, Giovanni, and their male family members could not be excluded as the source of this DNA. Fryer concluded that the DNA profile on the grip has only been observed in 1 out of 338 individuals, and the profile from the slide has been observed in 1 out of 352 individuals. Finally, Fryer determined that Jeanette's blood was on Bordeaux's sweatpants and his jacket.

[¶32.] Results from the GSR analysis were presented by Tarah Helsel, the forensic scientist who analyzed the GSR swabs taken from Bordeaux, Giovanni, and Jeanette's hands. Samples were taken from the palm and back of both the left and right hands of the three individuals. GSR analysis confirmed that Jeanette had considerably more gunshot residue on her hands, as compared to the residue on Bordeaux and Giovanni, who both had small amounts of residue on their hands. Helsel explained that finding GSR on one's hands is consistent with that person having fired a gun but she qualified her answer by stating that she could not definitely determine, based on the quantity of GSR on a person's hands, how or why GSR got there. She explained that being in proximity to a firearm when it is discharged could result in GSR depositing on one's hands. She further explained that GSR particles may transfer off the skin easily by touching objects, washing hands, and placing hands in pockets. When asked whether rubbing and pulling out grass or grabbing snow would have any effect on GSR, Helsel responded that "any time there is a touching, a wiping, any contact with the hands [creates] an opportunity for particles to be removed."

[¶33.] As to the other forensic evidence admitted at trial, Paulette Sutton, a bloodstain pattern expert, described the blood on the back of Jeanette's right hand as being consistent with a "transfer blood stain." She explained that this type of stain would not result from blood naturally flowing onto her hand, rather, it was transferred onto her skin when another bloody object came into contact with her skin. Sutton's report, which was admitted as an exhibit and included photographs of Jeanette taken at the crime scene, noted that "the amount of transferred blood staining on the dorsal surface of her right hand is not congruent with the amount of available blood depicted in the location of her hand as shown in these photographs." She explained that the pool of apparent blood was on the seat of the sofa under Jeanette's right arm. There was also a transfer stain on Jeanette's right palm, with a void area—described as "an absence of blood in an otherwise continuous bloodstain"—containing no blood on the portion of the palm directly under the thumb. There were a few drip stains on her right thigh along with a small transfer stain. Additionally, there was a blood transfer stain on the gun and no evidence of blood dripping or flowing directly onto the gun.

[¶34.] Sutton also described the blood stains in the bathroom. She testified that a transfer blood stain on the door frame leading into the bathroom had characteristics of movement, meaning whatever object transferred the blood to the door frame was in motion when it touched the frame. There was a blood drip on the floor of the bathroom, meaning that "something was in that area above this particular surface that had a sufficient amount of blood on it for a drip to be

created, to break free and fall." Additionally, there was a diluted bloodstain in the bathroom sink.

[¶35.] Finally, Sutton described how it appeared to her that Jeanette's right hand was picked up and placed on top of the gun, which likely did not fall into her lap naturally after the shooting. She testified that it is unlikely that the gun would have fallen into the position it was found in because, as explained by Dr. Habbe, once the bullet connects with the brain, the individual will lose muscle control.

[¶36.] As to the forensic examinations related to the handgun, Frans Maritz, a forensic firearm and toolmark examiner, testified that he determined from the class and individual characteristics of the cartridge case found in the hotel room and a bullet fragment recovered from Jeanette's skull that the bullet was fired from the 9-millimeter handgun recovered from the hotel room. The State also presented testimony from Heather Specht, who explained that she was unable to locate any latent fingerprints on the gun that would be suitable for comparisons.

[¶37.] The State's next witness was Herrboldt, but prior to calling her to testify regarding the other act evidence, Bordeaux's counsel renewed his opposition to this evidence and the circuit court heard arguments from counsel for both parties outside the presence of the jury. Bordeaux's counsel noted the State's comment in its opening statement, when referring to the prior assault, that "the Defendant is a violent individual when he is drinking." Defense counsel argued that the State intended to call Herrboldt "to show that Mr. Bordeaux acted in conformity with his conduct on a previous occasion in that he got drunk and became violent." Additionally, counsel asserted that no evidence admitted at trial had established

that Bordeaux was intoxicated during the event on January 1, 2020. Counsel argued it was therefore apparent that the State's only purpose at this point for offering the evidence was "to place Mr. Bordeaux in a light of having bad character[.]"

[¶38.] The State responded, noting that it was not asserting that Bordeaux was "drunk" but that he had been "drinking," and there was evidence at trial that all three people in the hotel room were drinking that night. When asked about the purpose for offering the Rule 404(b) evidence, the State explained:

> [T]his Defendant can be violent when he is drinking alcohol. There is evidence that he was drinking alcohol on the night of this incident when Ms. Jumping Eagle was shot. There is s evidence that on the incident in September of 2019 another violent act took place, that time with a knife, and that there is evidence that he was drinking in . . . that incident also.

[¶39.] Bordeaux's counsel then argued the State's expressed purpose for offering the evidence would not meet the standard for showing a permissible use of such evidence under Rule 404(b) because the facts of each case are "extremely dissimilar." Counsel noted that the September 2019 assault involved a male victim; Herrboldt was not an eyewitness to the entire ordeal, and she was the one who cleaned up the scene, disposing of the evidence; Bordeaux was not questioned by law enforcement after the assault; and the victim never cooperated with law enforcement, rather he reported that he fell. In response to these additional arguments, the State asserted that the evidence was admissible "to show the Defendant's intent and the scheme or plan," noting:

> In both assaults the Defendant was drinking with his victim in the early morning. After a verbal argument, the Defendant suddenly and violently attacks the victim with a deadly weapon. After calming down he profusely apologizes, cradles the victim,

engages in a cover up, and runs from the police, similar to the facts of this incident.

After considering the parties' arguments, the court stated it would allow the evidence to be admitted.[6]

[¶40.]    Herrboldt was then called at trial to testify about the September 2019 assault. She testified that when she came home at 7:00 or 8:00 p.m. that evening, Bordeaux was at their residence drinking with Marshall. She spent the remainder of the evening in another room getting her daughter ready for bed. Around 2:00 or 3:00 a.m., she sent a text message to Marshall because they were being "super loud." She testified that she "didn't hear what was occurring[.]" When Marshall did not respond to her text, she left her room to see what was going on. She stated she then saw "Kane and Dion up against kind of like my window, and Dion was stabbing Kane."[7] She described how Marshall was trying to subdue Bordeaux, pinning him to the ground. She then tried to persuade Bordeaux to release his knife, but he said he was afraid that Marshall would retaliate. After she told him she would not let that happen and that they needed to get Marshall to the hospital, Bordeaux eventually dropped the knife.

---

6.    The circuit court also included in the final jury instructions an instruction stating that the jury could not use the other act evidence to decide whether the defendant committed the charged offense; rather, it could only consider the evidence to determine intent or common scheme.

7.    Herrboldt's claim that she saw Bordeaux stabbing Marshall was not included in the police reports attached to the State's proffer submitted in conjunction with its motion to admit this evidence. Defense counsel cross-examined Herrboldt about this inconsistency at both the motion hearing and at trial.

[¶41.]     Herrboldt further testified that she believed the two men were "so wasted that they didn't really realize what was going on, because Dion immediately started apologizing." She explained that Bordeaux then helped Marshall down the stairs of their apartment and rode along with Marshall in a car driven by her neighbor, who agreed to take them to the hospital. After the men left the home, Herrboldt cleaned up the flesh and bloodstains in the apartment, threw away the empty beer cans, and disposed of the knife Bordeaux had used and other bloody objects. Herrboldt did not call the police, but they showed up at her house shortly after Marshall arrived at the hospital. In her initial conversation with the police, Herrboldt lied to them, reporting that Marshall was already injured when he arrived home at around 3:00 a.m. However, she called the police back shortly thereafter and told them the truth about what had happened. She also retrieved everything she had disposed of and turned the items over to law enforcement.

[¶42.]     After Herrboldt testified, the State called Detective Trainer to testify about the different account of the events in question that Bordeaux provided in his second interview. The State also called, as its final witness, Detective Jeremy Stauffacher, who examined and extracted data from Jeanette's cell phone. He testified regarding a text message exchange that occurred between Jeanette and Bordeaux on December 20, 2019.[8] This conversation consisted of the following incoming text messages from Bordeaux and outgoing responses from Jeanette:

---

8.     Prior to Detective Stauffacher's testimony, another investigator, Steve Neavill, testified that the phone number associated with the person sending these texts to Jeanette was the same number from which Bordeaux made the 911 call after the shooting.

> Bordeaux: OK then jen
>
> . . .
>
> Jeanette: I ain't dumb . . . I put up w this shit before lmao
>
> Bordeaux: Bitch, I love you, now I got to kill you :(
>
> Jeanette: I ain't dumb n I ain't scared
>
> Jeanette: W my own gun k
>
> Bordeaux: I didnt fucking cheat but okayyyyy jen
>
> Jeanette: U did . . . I ain't dumb
>
> Bordeaux: Lol
>
> Jeanette: Fuck you
>
> Bordeaux: Hi I wouldn't
>
> Jeanette: Stupid ass
>
> Bordeaux: Your mine
>
> Jeanette: Nahhh
>
> Bordeaux: Aint no changing that

[¶43.] At the close of the State's evidence, Bordeaux moved for a judgment of acquittal and the circuit court denied the motion. Bordeaux then rested without calling any witnesses. After closing arguments from counsel, the case was submitted to the jurors, who found Bordeaux guilty of first-degree murder. At a later sentencing hearing, the circuit court sentenced Bordeaux to life imprisonment in the penitentiary without parole.

[¶44.] Bordeaux appeals, asserting the following issues for our review:

> 1. Whether the circuit court abused its discretion by admitting other act evidence.

2.      Whether admission of the other act evidence was prejudicial.

**Standard of Review**

[¶45.]      We review a circuit court's decision to admit other act evidence for an abuse of discretion. *State v. Evans*, 2021 S.D. 12, ¶ 25, 956 N.W.2d 68, 79. "An abuse of discretion 'is a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary or unreasonable.'" *State v. Taylor*, 2020 S.D. 48, ¶ 23, 948 N.W.2d 342, 350 (citation omitted). To warrant reversal, "a defendant must prove not only that the trial court abused its discretion in admitting the evidence, but also that the admission resulted in prejudice." *State v. Carter*, 2023 S.D. 67, ¶ 24, 1 N.W.3d 674, 685 (citation omitted). To establish prejudice, there must be a reasonable probability that the jury verdict "would have been different" absent the admitted evidence. *See id.* ¶ 26, 1 N.W.3d at 686. "In other words, 'a probability sufficient to undermine confidence in the outcome.'" *Id.* (citation omitted).

**Analysis and Decision**

*1.      Whether the circuit court abused its discretion by admitting other act evidence.*

[¶46.]      "Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." SDCL 19-19-404(b)(1). However, such evidence may be admissible for other purposes, such as "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." SDCL 19-19-404(b)(2). Before admitting other acts evidence, a court "must

determine whether the evidence is relevant to a material issue other than character and whether its probative value is substantially outweighed by the danger of unfair prejudice." *Evans*, 2021 S.D. 12, ¶ 25, 956 N.W.2d at 79. *See also* SDCL 19-19-403 (authorizing a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice").

[¶47.]     Here, the jury was instructed that it could consider the evidence of Bordeaux's prior aggravated assault for the purposes of determining intent or common scheme. Bordeaux asserts that the circuit court abused its discretion in admitting this evidence because it was not sufficiently similar to the charged offense. He argues the September 2019 assault and the alleged shooting of Jeanette did not involve similar victims, nor were they similar crimes. He notes that Marshall and Bordeaux were distant cousins and long-time friends, while Bordeaux and Jeanette were romantic partners.

[¶48.]     He further argues that the assault against Marshall was not similar to the alleged premeditated murder of Jeanette. He emphasizes that while there was evidence admitted at trial that the relationship between Jeanette and Bordeaux was troubled, there were no facts introduced as evidence to explain what caused the argument between Bordeaux and Marshall. Additionally, he points to the differing testimony regarding his level of intoxication during the two incidents. In particular, he notes the testimony that during the September 2019 assault, both he and Marshall were highly intoxicated, as compared to a lack of evidence indicating he was intoxicated on the night of Jeanette's death. Bordeaux therefore argues that "no commonalities existed between the prior acts and the present charge" and that

admitting the other act only tended to prove that he has the propensity to recommit a violent crime.

[¶49.] In response, the State asserts that the September 2019 assault and Bordeaux's shooting of Jeanette were "functionally identical" acts. As it argued below, the State notes the following similarities:

> In both incidents Bordeaux had been drinking with his victim into the early morning hours and had been arguing with the victim before suddenly and violently attacking the victim with a deadly weapon. Afterward, Bordeaux became contrite and apologetic and engaged in a cover up.

While acknowledging that one incident involved a male cousin and the use of a knife while the other involved a girlfriend and the use of a gun, the State maintains that these are distinctions without a difference.

[¶50.] The State analogizes this case to *State v. Wright*, 1999 S.D. 50, 593 N.W.2d 792, which involved a defendant charged with felony child abuse. In *Wright*, the Court upheld the admission of evidence pertaining to previous instances in which the defendant had similarly punished his children, to show "an overall plan or design to abuse his children when given any provocation." *Id.* ¶ 21, 593 N.W.2d at 801. The State argues that Bordeaux's September 2019 assault and the murder charge at issue similarly show a "design to assert dominance in familial settings through violence."

[¶51.] In considering the admissibility of other act evidence, this Court has held that such evidence "'is admissible when similar in nature and relevant to a material issue[.]'" *State v. Boe*, 2014 S.D. 29, ¶ 20, 847 N.W.2d 315, 320 (quoting *Wright*, 1999 S.D. 50, ¶ 16, 593 N.W.2d at 800). "'The degree of similarity required for other act evidence will depend on the purpose for which it is offered.'" *Id.*

(quoting *Wright*, 1999 S.D. 50, ¶ 16, 593 N.W.2d at 800). We have recognized that "'[w]here specific intent is an element of an offense, proof of similar acts may be admitted to carry that burden even if the defense to the charge is a complete denial.'" *State v. Otobhiale*, 2022 S.D. 35, ¶ 26, 976 N.W.2d 759, 769 (citations omitted). "When considering whether admission of . . . [other] acts is probative of intent, trial courts should compare, among other factors, the similarity between the . . . [other] acts and the crimes with which the defendant is charged." *Id.*, 976 N.W.2d at 769–70 (alterations in original); *see Novak v. McEldowney*, 2002 S.D. 162, ¶ 15, 655 N.W.2d 909, 914 (noting that factors to consider are whether there are similar victims and similar crimes involved).

[¶52.]     With respect to other act evidence offered to show a common plan or scheme, we have held that such evidence must "'support the inference that the defendant employed that plan in committing the charged offense.'" *Evans*, 2021 S.D. 12, ¶ 30, 956 N.W.2d at 80 (quoting *Wright*, 1999 S.D. 50, ¶ 18, 593 N.W.2d at 800). "The other act evidence must demonstrate not merely a similarity in results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations." *Id.* (citation modified). Importantly, the charged offense and the other acts must "'have sufficient points in common.'" *Id.* (citation omitted).

[¶53.]     Here, it is apparent from the evidence introduced at trial that the September 2019 assault bears little resemblance to the shooting of Jeanette, aside from the fact that both were violent acts. Although the circuit court relied on what it deemed to be a similarly close familial relationship between Bordeaux and the

named victims, there are distinct differences between the two. Jeanette and Bordeaux were involved in a romantic relationship whereas Marshall was a distant cousin/friend and drinking buddy of Bordeaux's.

[¶54.] Also, based on the record before us, the nature of the two crimes cannot be characterized as similar. With respect to the murder charge, the State offered evidence to support its theory that it was the volatile domestic relationship between Bordeaux and Jeanette that precipitated the shooting. In contrast, the facts of the September 2019 assault against Marshall are ill-defined. Herrboldt testified that she did not know what precipitated the stabbing of Marshall. In fact, there was no evidence offered or admitted of *any* intent or motive underlying Bordeaux's assault of Marshall. Instead, Herrboldt testified that both men were so intoxicated that they did not realize what was happening. Additionally, unlike the testimony regarding Marshall and Bordeaux being obviously intoxicated during the September 2019 assault, there was no evidence admitted at trial suggesting that Bordeaux was in a similarly intoxicated state.[9]

[¶55.] Finally, each act, while violent, was much different from the other. In the prior assault, Bordeaux repeatedly stabbed Marshall with a knife, but the act underlying the murder charge is a single gunshot to Jeanette's forehead. There are also notable differences between the aftermaths of each incident. While the State claims that Bordeaux engaged in a cover-up in both cases, the State's theory that

---

9. Although there was testimony at trial that Bordeaux submitted to a preliminary breath test, when Bordeaux's counsel asked Officer Husfeldt if he learned that the result of the PBT was a .06, Officer Husfeldt stated that he did not see the result. He agreed, however, that Bordeaux was not incoherent and did not appear to be "stumbling drunk."

Bordeaux staged the crime scene to make Jeanette's murder look like a suicide is far different from Herrboldt's testimony regarding what occurred after the assault of Marshall. It was Herrboldt who cleaned up the crime scene and disposed of the knife and bloody items in her apartment after Bordeaux stabbed Marshall.

[¶56.] For these reasons, there is not a sufficient degree of similarity between the September 2019 assault and Jeanette's shooting to render the evidence regarding the aggravated assault admissible to prove intent or a common plan or scheme. Instead, the State improperly used this evidence in both its opening statement and in its closing argument to show that Bordeaux has a propensity to act violently when drinking. The admission and use of such evidence in this manner "violated the well-established rule precluding character or propensity evidence." *State v. Rouse*, 2025 S.D. 29, ¶ 39, 23 N.W.3d 467, 479. Therefore, the circuit court abused its discretion when admitting this evidence.

[¶57.] JENSEN, Chief Justice, and KERN, SALTER, and MYREN, Justices, concur on Issue One.

**[¶58.]** **JENSEN, Chief Justice, writing for the Court on Issue Two.**

> ### 2. *Whether admission of the other act evidence was prejudicial.*

[¶59.] In order to reverse his conviction, Bordeaux must also prove that the erroneous admission of other act evidence resulted in prejudice. *State v. Lassiter*, 2005 S.D. 8, ¶ 13, 692 N.W.2d 171, 175. Prejudice exists when there is "'a reasonable probability that, but for [the error], the result of the proceeding would have been different.'" *Carter*, 2023 S.D. 67, ¶ 26, 1 N.W.3d at 686 (alteration in original) (citation omitted).

[¶60.]     The Court must weigh a number of factors to determine whether an error was prejudicial: "'the importance of the witness'[s] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony . . . [,]the extent of cross-examination otherwise permitted, and . . . the overall strength of the prosecution's case.'" *State v. Thoman*, 2021 S.D. 10, ¶ 47, 955 N.W.2d 759, 773 (alterations in original) (citations omitted).  In *Thoman,* we held that certain erroneously admitted victim impact testimony regarding threats made by the defendant, offered to establish criminal intent, was not prejudicial because the State presented the testimony of three other witnesses regarding those same threats, along with an audio recording of a conversation where the defendant made a threat.  *Id.* ¶ 49, 955 N.W.2d at 773.  Further, we noted that the improperly admitted testimony only amounted to "roughly five questions in a four-day trial with a dozen witnesses" and that the State only briefly mentioned the testimony in its closing.  *Id.*

[¶61.]     Here, the evidence of the prior violent stabbing by Bordeaux of his cousin was neither an insignificant part of the State's case, nor cumulative.  Unlike *Thoman*, Bordeaux's prior violent conduct was a key piece of the State's case to prove that Bordeaux had murdered Jeanette.  Herrboldt's testimony about this incident during the trial comprised 20 pages of the transcript.  She testified extensively about the prior, unrelated bloody and violent attack by Bordeaux in which he stabbed his cousin multiple times with a knife, without provocation.  The State also wove this evidence into its opening, closing, and rebuttal arguments.  Bordeaux was permitted to cross-examine Herrboldt, but defense counsel was

placed in the untenable position of challenging a witness whose testimony he believed was inadmissible and who continued to remind the jury of Bordeaux's prior violent actions.

[¶62.] The evidence served no purpose other than to convince the jury that Bordeaux had a propensity for violence when intoxicated and that he intentionally acted in conformity with that propensity on the night that Jeanette was killed. This powerful, inadmissible evidence would have placed Bordeaux on an unlevel playing field from the start, as the very first words the jury heard from the State during its opening statement were, "Ladies and gentlemen, the defendant, Dion Bordeaux, is a violent individual when he is drinking." It is difficult to conceive how the evidence would not have impacted the jury's consideration of the case and Bordeaux's involvement in Jeannette's death.

[¶63.] In considering the overall strength of the State's case, Bordeaux's principal defense was that this was not a homicide, but rather that Jeanette took her life by suicide. *See* SDCL 22-16-1 (defining homicide as "the killing of one human being . . . by another."). Although the medical examiner was unable to rule out suicide, the State presented other evidence that this may not have been a suicide. Nonetheless, the conviction for first-degree murder also required the State to prove premeditation. The strength of the State's case on the question of intent was far from overwhelming.[10]

10. The jury was instructed on first-degree murder, second-degree murder, and first-degree manslaughter. A conviction for first-degree murder under SDCL 22-16-4(1) required the State to prove that Bordeaux had a "*premeditated design* to effect the death of the person killed[.]" (Emphasis added.) For

(continued . . .)

[¶64.] Bordeaux and Jeanette had been arguing throughout the evening and Bordeaux claimed that Jeanette had shoved him at one point. However, there was no eyewitness testimony to the shooting or to the events immediately before Jeanette was shot with her own gun. The State presented evidence that Bordeaux had threated to kill Jeanette a couple of weeks earlier during a text exchange, when she accused him of cheating, but there was no evidence of other threats by Bordeaux, or prior violence toward Jeanette at any time, and particularly on the night of the shooting. While some of Bordeaux's words and actions after Jeanette's death may have suggested a consciousness of guilt in a homicide, this evidence did not bear on his intent at the time of the shooting. The evidence at trial would have allowed the jury to consider a range of possibilities that may have led to the shooting, including, as the State acknowledged during closing, that Bordeaux acted without any design to kill Jeanette. On this record, the jury would have needed to piece together evidence and inferences to decide whether or not the killing was intentional.

[¶65.] The circuit court's cautionary instruction informing the jury it could consider Bordeaux's prior conduct "*to determine intent* or common scheme" further contributed to the error and prejudice on this record. (Emphasis added.) The

_____

(. . . continued)

second-degree murder under SDCL 22-16-7, the jury was instructed that Bordeaux had to perpetrate an "act imminently dangerous to others and evincing a depraved mind, without regard for human life," but without any premeditated design. Finally, for first-degree manslaughter under SDCL 22-16-15(3), the State was required to prove Bordeaux killed Jeanette "by means of a dangerous weapon[,]" and that he did so "[w]ithout any design to effect [the] death" of Jeanette.

instruction told the jury that it could consider Bordeaux's use of deadly force in the prior unrelated aggravated assault to determine Bordeaux's intent in this case.

[¶66.] Given the green light for the jury to consider this evidence on the question of intent, the State argued in its closing and rebuttal that Bordeaux's prior violent conduct established that this was not manslaughter. After acknowledging that the evidence could support an accidental shooting, the State said:

> I would like for you to consider first and second degree murder[]. Consider what had happened that night. [Bordeaux] was mad. He was upset. And we know what he is like when he gets mad and has been drinking. He gets violent. Do we know exactly what set him off? Do we know exactly what caused him to get mad at her? . . . We don't know exactly why but, again, we don't have to prove the why. This is not a suicide. That only leaves a killing, an intentional killing.

Later in rebuttal, the State argued, "Again, we don't have to prove why, but we all want to know why. Right? Well, why did he stab Kane Marshall a few years ago? Because he gets violent. He gets violent when he's drunk, and he acts without regard for his victims."

[¶67.] Based upon the overall record, including the absence of strong evidence on the question of Bordeaux's intent and the use of this evidence by the State to buttress intent, there is a reasonable probability that, but for the errors, the result may have been different. "The potential for prejudice is great during closing arguments, especially when the defense has no opportunity for rebuttal." *United States v. Holmes*, 413 F.3d 770, 776 (8th Cir. 2005). *See also United States v. Johnson*, 968 F.2d 768, 772 (8th Cir. 1992) (citation omitted) ("'If the evidence of guilt is overwhelming, an improper argument is less likely to affect the jury verdict.

On the contrary, if the evidence of guilt is weak or tenuous, the existence of prejudice is more easily assumed.'") (citation omitted).

[¶68.] We reverse and remand for a new trial because there is a reasonable probability that the result of the proceeding would have been different but for the admission of the other act evidence.

[¶69.] SALTER and MYREN, Justices, concur on Issue Two.

[¶70.] KERN and DEVANEY, Justices, dissent on Issue Two.

DEVANEY, Justice (dissenting on Issue Two).

[¶71.] Although the admission of the other act evidence and the manner in which the State referred to it is no doubt problematic, I cannot concur with the view that there is a reasonable probability that the jury would have rendered a different verdict had this evidence not been admitted. The majority opinion concludes otherwise, largely based on the view that there was an absence of strong evidence on the question of Bordeaux's intent, and that the State used the other act evidence to "buttress intent" and argue that a murder, rather than a manslaughter, had occurred here. In my view, neither premise is sound.

[¶72.] Contrary to the majority opinion's statement that Bordeaux's "principal" defense was that Jeannette committed suicide, this was his *only* defense. When presenting the evidence, neither party suggested this was anything other than a murder or a suicide. In fact, Bordeaux argued *against* submitting lesser-included offense instructions to the jury and he did not make any alternative argument to the jury that what happened here was a manslaughter. Nor has he advanced any such argument on appeal. And although the State did request

lesser-included offense instructions, it never presented an argument to the jury that was *tied to actual evidence admitted at trial* that would support a manslaughter verdict. Instead, when referring to the lesser offenses, the State posed hypothetical scenarios to the jury, stating, "If you believe the two of them were arguing, the gun came out, the gun was brandished, it was moved around, and then [Bordeaux] accidentally shot Jeanette, then he's guilty of first degree manslaughter." Aside from the fact that an accidental shooting, if meeting the legal definition of an excusable homicide, would not constitute first-degree manslaughter, defense counsel pointed out to the jury, in response, that the State's hypothetical scenarios were speculative. Indeed, defense counsel asked the jury not to convict Bordeaux on such speculation.

[¶73.]     The vast majority of the evidence introduced at trial, and the arguments made to the jury in closing, were centered on the highly incriminating forensic and other evidence showing that Bordeaux intentionally shot Jeanette and tried to make her death look like a suicide. This included Bordeaux's disparate accounts of what occurred, the inconsistencies between his versions of what happened and the evidence in the hotel room and on the hotel hallway surveillance video, the incriminating statements Bordeaux made to Giovanni after the shooting, and the incriminating text message exchange he recently had with Jeanette.

[¶74.]     On appeal, to support his argument that he was prejudiced by the admission of the other act evidence, Bordeaux's critique of the State's evidence is very limited. He notes that the forensic pathologist could not rule out a suicide; claims that inconsistencies from the State's witnesses regarding who first handled

the gun makes the reliability of the blood transfer stains questionable; and argues, based on Giovanni's testimony, that he would not have had time to shoot Jeanette, place the gun in her lap, and move back toward the wall in the time it took Giovanni to hear the gunshot and come out of the bathroom.

[¶75.] However, the trial transcript, when read in its totality, does not support Bordeaux's assessment of the evidence. Giovanni testified that after hearing the gunshot, he finished urinating and zipped up his pants before opening the door and leaving the bathroom. Importantly, he testified that after he came out of the bathroom, he saw Bordeaux walk toward Jeanette and stand in front of her, and he could not see what Bordeaux was doing with his hands. Bordeaux's claim regarding the reliability of the blood transfer stains is also unsustainable in light of the indisputable evidence of blood transfer stains on both the gun and Jeanette's right hand and Bordeaux's admission that he touched Jeanette after the shooting and washed her blood off his hands after doing so. In fact, his trial counsel conceded, in closing argument, that evidence supports that Jeanette's hand and the gun had both been moved after she was shot, stating, "[w]e know that" because "Dion had blood on his hands." All the forensic evidence points to Bordeaux as the one who placed the gun on Jeanette's lap and her hand on top.

[¶76.] In addition to the obvious indications of the staging that occurred at the crime scene after Jeanette was shot, there were several other key pieces of evidence showing that Jeanette did not commit suicide. The stippling on her skin around the entrance wound on her right forehead established that this was not a contact wound, but rather a wound caused by a gun fired from a short distance

away from her forehead. This is inconsistent with a typical suicide which, according to Dr. Habbe, most commonly involves a contact wound to the temple. In addition, the straight downward trajectory of the bullet was consistent with the gun having been fired at close range by a shooter (Bordeaux) standing directly in front of Jeanette, who was seated on the couch and most likely holding her phone in her right hand. This is evident given that the charging cord connected to the phone was wrapped around a finger on her right hand when she was later found deceased.

[¶77.]     Also, while Dr. Habbe did not offer an opinion as to the manner of Jeanette's death, he explained that a determination of whether a shooting of this nature was a homicide, suicide, or an accident, is made by others based on the investigation by law enforcement regarding the surrounding circumstances. Here, such circumstances include the text message exchange between Bordeaux and Jeanette just days before she was shot, during which they were arguing about Bordeaux's infidelity. This exchange appears to preview what was to come. In the context of Jeanette refusing to accept his denials, Bordeaux stated, "Bitch I love you. *Now I gotta kill you* :(" to which Jeanette responded, "*W my own gun k*[.]" (Emphasis added.) There was no indication from this exchange that Jeanette would be so distraught if Bordeaux left her that she would kill herself. Instead, she stated, "I ain't dumb n I ain't scared[.]" She also refuted his declaration, "Your [sic] mine[,]" with "Nahhhh[,]" followed by Bordeaux stating, "Aint no changing that." Other than Bordeaux's later self-serving statement in his second interview—when confronted with evidence refuting his initial version of the events—that Jeanette

said she would "just die" if he left her, there was no evidence offered at trial that Jeanette was, or ever had been, suicidal.

[¶78.] And perhaps the most incriminating evidence that this was not a suicide came from Bordeaux himself, who, according to Giovanni, while running away from the hotel kept repeating, "I'm sorry" and stating, "I fucked up." He thereafter lied to law enforcement, claiming that he heard a gunshot and thought Jeanette was shooting at him, so he ran from the hotel room with his brother. Notably, he admitted, in the second interview, that he touched Jeanette after the shooting and washed her blood off his hands, but he did not admit to causing the blood transfer stains on the gun. However, his further statements revealed that he was in possession of Jeanette's gun on the night of the shooting. When asked if he had touched the gun, Bordeaux told Detective Trainer that he had shot this gun earlier that evening at the railroad tracks by a nearby Walmart.

[¶79.] Finally, Bordeaux's claim that he and his brother were in shock and took off running from the hotel room was directly refuted by the footage retrieved from the video surveillance of the hotel hallway. Rather than depicting two panicking brothers fleeing from a hotel room after having witnessed a suicide, it shows Bordeaux, hands in his pockets, calmly leaving the hotel room, followed by his brother, who stops to make sure the door is locked, and both walking slowly and casually down the hallway.

[¶80.] Prejudice sufficient to undermine confidence in a jury's verdict can only be established by showing a *reasonable probability*, in light of *all* the evidence, that a jury would have reached a different verdict absent the other act evidence.

The mere *possibility* that Jeanette could have committed suicide, one that is largely unsupported and refuted by the totality of the record, is insufficient to undermine confidence in the outcome of the case. Here, the evidence properly before the jury all points to Bordeaux shooting Jeanette, at close range, in the forehead *with her own gun*—as she predicted just days before—after he told her he would have to kill her. Therefore, I respectfully disagree with the contention in the majority writing that there was an absence of strong evidence on the question of Bordeaux's intent. Shooting someone in the forehead at close range certainly evinces an intent to kill. On this record, there is no reasonable probability that the jury would have reached a different outcome. I would therefore affirm Bordeaux's conviction.

[¶81.]     KERN, Justice, joins this writing.